**STATE of Minnesota, Respondent,**

v.

**Tim DAVIS, Appellant.**

**Nos. C7–87–1685, C4–87–1711.**

Court of Appeals of Minnesota.

April 19, 1988.

Hubert H. Humphrey, III, Atty. Gen., Robert A. Stanich, Sp. Asst. Atty. Gen., St. Paul, Michael A. Fahey, Carver County Atty., Chaska, Pete Kasal, Acting Carver County Atty., Glencoe, for respondent.

Renee Bergeron, Asst. State Public Defender, St. Paul, for appellant.

Considered and decided by NIERENGARTEN, P.J., and LANSING and SCHUMACHER, JJ., without oral argument.

## OPINION

SCHUMACHER, Judge.

A Carver County jury found appellant, Tim Davis, guilty of first degree intrafami-

lial sexual abuse and first degree criminal sexual conduct. Davis appeals from both the judgment of conviction and the order denying a new trial.

## FACTS

The victim, A.M., is the stepdaughter of Tim Davis. A.M. was five years old when her mother married Davis. Together with A.M.'s three older brothers, the family resided in Minneapolis until July 1984, at which time the family moved to Chaska.

The alleged sexual abuse began in 1982 in Minneapolis, when A.M. was 12 years old, and continued after the family moved to Chaska. A.M. testified appellant first began sexual contact by asking her to touch his penis and by removing her clothing so he could check her breast and pubic hair development. Sometime in the summer of 1983, appellant began having intercourse with A.M., and this continued approximately once a week while the family resided in Minneapolis. A.M. testified that it took place at home when A.M.'s mother was at work and in Davis' truck when he took her fishing.

The first specific incident to which A.M. testified involved Davis massaging A.M. and stating, "[A], do you know that you really turn me on." Other specific incidents which she testified to include: Davis told A.M. to touch his penis while they were in the basement laundry room; Davis showed a pornographic movie to A.M., followed by mutual oral sex; sexual penetration in the pickup truck while parked in a secluded area; attempted sexual penetration in the shower; attempted sexual penetration in bed with A.M.'s mother after the mother had gone to sleep; one act of sexual intercourse in Davis' bedroom in Chaska; and attempted oral sex in A.M.'s bedroom in Chaska.

During the 1984–85 school year, A.M. became friends with A.B., who lived in a foster home. A.B. told A.M. that A.B. had been sexually abused by her brother, and A.M. then told A.B. about the abuse by her stepfather. A.B. told A.M. that if it ever happened again, A.B. was going to make her go to the police and report it. On Sunday, March 17, 1985, the two girls were together during the day and discussed sex abuse. That evening, Davis again attempted to have sex with A.M. A.M. testified that she got up at 11:30 or 12 o'clock midnight and Davis brought her into her bedroom and was going to perform oral sex on her when she said no.

The next day at school, A.M. told A.B. Davis had abused her again and the two went to the Chaska police. Detective Warren Breezee took a taped statement from A.M. Breezee then formally charged Davis and A.M. was placed in foster care.

After reporting the abuse, A.M.'s family rebuffed her. In response to a question regarding her family's reaction to her report, A.M. testified that one brother "put his fist through the window and started to space out." The other brother threatened A.M. in the school parking lot and told her she was not going to "win this case."

The trial took place in April 1987. At the trial, an expert was allowed to testify regarding common characteristics of sexually abused adolescents. Davis was found guilty on both counts and sentenced to 41 months.

Sometime shortly after Davis began serving his sentence, A.M. wrote a letter to him recanting her trial testimony. According to her testimony, A.M. wrote the letter on June 13, but did not sign it or date it until June 21, 1987. A.M. spent June 21 with her brother, Geoff, at her mother's house. Geoff agreed to mail the letter to Davis for A.M. Geoff then mailed the letter to defense counsel. Defense counsel filed a motion for new trial and on June 30, 1987, A.M. completely recanted her trial testimony in open court. Subsequently, the trial court issued detailed findings, quoting from the recanted testimony at length, finding that the recanted testimony was not credible because it was inconsistent itself and inconsistent with the testimony of other witnesses.

## ISSUES

1. Did the trial court abuse its discretion in allowing expert testimony regarding

common behavioral characteristics of sexually abused adolescents?

2. Did the trial court err in denying Davis' motion for a new trial based on the victim's recantation of her trial testimony?

## ANALYSIS

### I. EXPERT TESTIMONY

Appellant challenges the admission of expert testimony on two grounds: First, that the expert was not qualified; and second, that the substance of the testimony was not admissible.

■ The qualification of an expert is a matter resting soundly within the discretion of the trial court, and a ruling on expert testimony will be reversed only upon a showing of an abuse of discretion. *State v. Sandberg*, 406 N.W.2d 506, 511 (Minn.1987) *citing Housing and Redevelopment Authority v. Kieffer Brothers Investment and Construction Co.*, 284 Minn. 516, 521, 170 N.W.2d 862, 865 (1969). A witness may be qualified to testify as an expert based on "knowledge, skill, experience, training or education." Minn.R.Evid. 702.

Jean Mitchell, a therapist with Carver County Mental Health, treated A.M. and testified as an expert at the trial. Mitchell's qualifications consisted of a bachelor's degree in elementary education and the course work, except for a dissertation, for a Ph.D in school psychology. She had been working for Carver County Mental Health for 7 years. The testimony does not indicate the number of sexual abuse cases she had handled overall, however, her present caseload was about eight to ten sexual abuse victims. Recent cases out of our supreme court cases have allowed witnesses with qualifications similar to Mitchell's to testify regarding child sexual abuse. *State v. Hall*, 406 N.W.2d 503 (Minn.1987) (clinical psychologist with Ph.D and about 60 active cases); *State v. Myers*, 359 N.W.2d 604 (Minn.1984) (same psychologist). Mitchell's caseload was not as extensive as the expert used in *Hall* and *Myers*. However, allowing her to testify did not violate the general rule for the qualification of

experts found in Minn.R.Evid. 702. While a better foundation regarding Mitchell's practical experience could have been made, allowing her to testify did not amount to an abuse of discretion.

■ Mitchell's expert testimony was admitted for the purpose of showing that certain behavior exhibited by A.M. was consistent with that commonly exhibited by sexually abused children. A series of recent cases has allowed expert testimony of common behavioral characteristics for sexually abused children. In *State v. Myers*, the supreme court held that it was within the trial court's discretion to admit expert testimony describing the characteristics typically observed in sexually abused children. *Myers*, 359 N.W.2d at 610. In *Myers*, the victim was 7 years old. The court stated that "background data providing a relevant insight into the puzzling aspects of the child's conduct and demeanor which the jury could not otherwise bring to its evaluation of her credibility is helpful and appropriate in cases of sexual abuse of children * * *." *Id.*

More recently, the supreme court upheld the trial court's admission of expert testimony concerning the common behavioral characteristics of a sexually abused adolescent. *Hall*, 406 N.W.2d at 505. However, the holding of *Hall* is limited to expert testimony as to the delayed reporting of such victims and to the continued contact by the adolescent victim with the assailant. The court specifically cautioned: "[W]e do not intend to establish a categorical rule that expert testimony concerning all characteristics typically displayed by adolescent sexual assault victims is admissible." *Id.* In *Hall*, the victim was 14 at the time of the assault and at the trial.

The supreme court has upheld the admission of expert testimony regarding delayed reporting of abuse when the victim was 13 at the time of the assault and 15 at the time of trial. *Sandberg*, 406 N.W.2d at 511. Additionally, this court affirmed the admission of expert testimony when the victim was 12 years old and the testimony consisted of the following traits common to sexually abused children: attempts to dis-

associate themselves from the conduct, delayed reporting, disclosure of allegations during a separation period, and recall of more details on further questioning. *State v. Garden,* 404 N.W.2d 912, 914 (Minn.Ct. App.1987) *pet. for rev. denied* (Minn. June 25, 1987).

In this case, the abuse began when A.M. was 12, which is younger than the adolescents in *Hall* and *Sandberg,* but older than the child in *Myers.* Mitchell testified about the delayed reporting, which is clearly admissible under *Hall* and *Sandberg.* She also testified that the adolescent victims may tend to "become very good and very mature and responsible and competent." What is more common, Mitchell testified, is for the victim to act out through "lying, stealing, running away, sexually acting out," and that this is caused by shame and guilt. The jury had already been presented with evidence that A.M. had been caught stealing at Target and had run away from numerous foster homes.

After describing the above characteristics, Mitchell testified regarding the conduct she observed, specifically that A.M. wore heavy makeup, appeared to be older than she actually was, used her sexuality for attention getting, and was troubled by separation from her mother. Mitchell then testified that this behavior was common in sexual abuse victims of the same age.

These are characteristics that the jury had already observed and may have found peculiar. The expert testimony was helpful to the jury in that it provided relevant insight into the cause of some of A.M.'s peculiar behavior, and assisted the jury in evaluating her credibility. Under these limited circumstances, the expert testimony is within the purview of *Myers.*

This testimony goes somewhat beyond the specific statements which have previously been found admissible. However, considering the age of the victim, it was not so broad as to amount to an abuse of discretion, and is within the contemplation of *Hall.*

## II. RECANTATION

■ Courts have traditionally looked with disfavor on motions for a new trial based on recantation unless there are extraordinary and unusual circumstances. *State v. Hill,* 253 N.W.2d 378, 384 (Minn. 1977).

When a motion for new trial is based on recanted testimony, the so-called *Larrison* rule provides that a new trial may be granted where:

(a) The court is reasonably well satisfied that the testimony given by a material witness is false;

(b) That without it the jury *might* have reached a different conclusion;

(c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

*Larrison v. United States,* 24 F.2d 82, 87–88 (7th Cir.1928) (emphasis in original).

In *State v. Caldwell,* 322 N.W.2d 574 (Minn.1982), the Minnesota Supreme Court applied *Larrison* to require a new trial when the testimony of the fingerprint expert was later determined to be inaccurate. *Id.* at 587.

The first element of *Larrison* requires that the court be "reasonably well satisfied" that the recantation is genuine and the trial testimony was false.[1] In this case, the trial court made detailed findings as to why the recantation was not credible. The Minnesota Supreme Court has affirmed the denial of a new trial based on recanted testimony where the recantation was made

---

**1.** In cases involving a recantation, courts have also applied the two-prong test set out in *Whelan v. State,* 298 Minn. 545, 214 N.W.2d 344 (1974), which provides that a new trial should be granted if:

(a) the defendant has acted with due diligence in seeking a new trial; and

(b) the court is *reasonably convinced* that the witness has indeed recanted and that without

this witness' perjured testimony at trial the jury might well have reached a different verdict.

*Id.* at 545, 214 N.W.2d at 344 (emphasis added). The same element was not met in this test, *i.e.,* the trial court was not "reasonably convinced" that the recantation was genuine.

under highly suspicious circumstances, the victim having been subjected to considerable pressure to recant. *State v. Walker*, 358 N.W.2d 660, 661 (Minn.1984).

The trial court had the benefit of observing the witness both at the time of trial and at the time of the recantation. The trial court's decision regarding the credibility of a recanting witness will not be reversed in the absence of a clear abuse of discretion. *Kerkhoff v. Kerkhoff*, 400 N.W.2d 752, 757 (Minn.Ct.App.1987) *pet. for rev. denied* (Minn. Mar. 25, 1987). After reviewing the trial testimony of A.M. and the recantation, we conclude that the trial court properly exercised its discretion in finding that the trial testimony was credible.

## DECISION

Affirmed.