588 A.2d 951

**COMMONWEALTH of Pennsylvania**

v.

**Jose GARCIA, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 18, 1990.

Filed March 28, 1991.

assert a privilege. Additionally, she would have been granted immunity and could not, therefore, incriminate herself.

Regina Boutcher and George Henry Newman, Philadelphia, for appellant.

Harriet R. Brumberg, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before CIRILLO, President Judge, and CAVANAUGH, WIEAND, OLSZEWSKI, DEL SOLE, POPOVICH, JOHNSON, HUDOCK and FORD ELLIOTT, JJ.

OLSZEWSKI, Judge:

This is an appeal from judgment of sentence. Jose Garcia was convicted following a jury trial of involuntary deviate sexual intercourse (18 Pa.C.S.A. § 3123); corruption of minors (18 Pa.C.S.A. § 6301); rape (18 Pa.C.S.A. § 3121); and criminal attempt, rape (18 Pa.C.S.A. § 901).[1] Garcia was sentenced to a term of seven to fifteen years for these convictions.

Garcia appealed the convictions to the Superior Court, which reversed the conviction and ordered a new trial in a split panel decision. *Commonwealth v. Garcia* (No. 01076 Phila.1989, filed June 4, 1990, Olszewski, J., dissent by Ford Elliott, J.). The Commonwealth petitioned for reargument before this Court *en banc;* having reviewed the record, the parties' briefs and arguments, we vacate the judgment of sentence and remand the matter for a new trial.

Garcia alleges seven instances of error by the trial court; due to our disposition of the first issue, we need not reach the other six. Garcia argues that the trial court erred in allowing the expert testimony of Alan R. DeJong, M.D., a pediatrician, clinical associate and professor of pediatrics, and a co-director of the Pediatric Sexual Assault Follow-up Program, who testified as to the typical behavior of child

---

1. Jose Garcia and Pat Garcia were tried jointly; however, Pat Garcia is not part of this appeal.

sexual assault victims. Garcia characterizes DeJong's testimony as an inadmissible attempt by the Commonwealth to bolster the credibility of the child witness/victims who testified against him. The Commonwealth argues that De-Jong's testimony was permissible observations of objective behavior demonstrated by other victims of child sexual abuse. We are constrained by recent opinions of our Supreme Court to agree with Garcia.

This case arose out of incidents alleged to have occurred in Garcia's home during 1985 and 1986. The Commonwealth presented the testimony of two children, ages nine and eight, indicating that Garcia had subjected them to multiple acts of sexual abuse during the time in question. The children's testimony contained inconsistencies and uncertainties as to the dates and number of the incidents of abuse; however, it was clear from their testimony that the children had delayed in reporting the incidents. The children also testified as to their reasons for failing to report the abuse promptly.[2] (*See* generally, N.T., vol. IV, V.)

The mother of the second victim testified that her daughter had told her of incidents of abuse. Other testimony indicated that an investigation commenced in late August 1986, and that Garcia was arrested on September 10, 1986.

At trial, Garcia relied upon the alleged victim's delay in reporting the abuse as a central element of his defense. Accordingly, the trial court instructed the jury how the delay should enter into their deliberations. (N.T., vol. VIII, P. 124–126.)

■ Certain aspects of DeJong's testimony centered on his observations of other abuse cases and the presence of

---

2. The first victim testified that she was frightened by a threat allegedly made by Pat Garcia, also that she had been previously sexually abused and did not wish to go through another court proceeding. (N.T., vol. IV, P. 55, 57.) The second victim explained that she had reported the first incident to her mother, who then told Pat Garcia to get help for Jose Garcia; the second victim continued to visit the Garcia home, as they were her baby-sitters. The second victim also testified that Garcia threatened to kill her if she reported the continuing abuse. (N.T., vol. V, P. 19–28.)

delay in those cases. Specifically, DeJong testified that one-third of child sexual abuse victims who report the incident do so within 24 hours; another third of the reporting victims do so within 24–72 hours; the remainder of the victims who report the incident may take up to years do so. (N.T., vol. VII, P. 69–70.) DeJong further testified as to the reasons why children delay in reporting sexual abuse. (*Id.* at 69–71.) [3]

The trial court allowed this testimony, relying upon *Commonwealth v. Baldwin*, 348 Pa.Super. 368, 502 A.2d 253 (1985). (Trial court opinion at 15–16.) *Baldwin* allows expert testimony regarding the behavior patterns of child sexual abuse victims as long as the expert does not opine as to the veracity of the child witnesses. *Baldwin, supra*, 348 Pa.Superior Ct. at 377, 502 A.2d at 257 (citations omitted). *Baldwin*, however, has been expressly overruled inasmuch as it conflicts with *Commonwealth v. Seese*, 512 Pa. 439, 517 A.2d 920 (1986), and *Commonwealth v. Davis*, 518 Pa. 77, 541 A.2d 315 (1988). *Davis, supra*, 518 Pa. at 81 n. 1, 541 A.2d at 317 n. 1. Our analysis, therefore, turns to an examination of what is left of *Baldwin* in light of *Davis* and other case law.

*Baldwin* permitted a social worker "to explain the dynamics of intra-family sexual abuse and the behavior patterns of the victims ... and why victims are often unable to recall exact dates or times or describe the specific incidents in detail." *Baldwin, supra*, 348 Pa.Super. at 373, 502 A.2d at 255. The *Baldwin* Court stated that the reactions and

---

**3.** DeJong also testified as to the presence and absence of physical trauma in child sexual abuse cases and the usual time frame for resolution of such trauma. (N.T., vol. VII, P. 64–69).

The remainder of DeJong's testimony discussed the typical abuser profile; the methods abusers use to cover their tracks; the percentage of abusers who are family members, friends of the family, and strangers; and the enormity of the child sexual abuse problem. (*Id.* at 70–74.) While our holding today renders our consideration of this portion of DeJong's testimony unnecessary, we note in passing that it was not relevant to any issue to be proven in the case. *Commonwealth v. McNeely*, 368 Pa.Super. 517, 520–24, 534 A.2d 778, 780–781 (1987), *alloc. denied*, 520 Pa. 582, 549 A.2d 915 (1988). The prejudicial impact of this testimony clearly outweighed its probative value, if any; this testimony was, therefore, inadmissible.

behavior of incest victims "are not matters of common knowledge and experience." *Id.,* 348 Pa.Superior Ct. at 377, 502 A.2d at 257–258 (citations omitted). The Court held that the behavioral and psychological characteristics of child sexual abuse victims are proper subjects of expert testimony. *Id.* Also, "so long as the expert does not render an opinion on the accuracy of the victim's recitation of facts, his or her general testimony on the dynamics of sexual abuse does not prejudice the jury." *Id.; see also, Davis, supra,* 518 Pa. at 81–82, 541 A.2d at 317.

In *Seese,* the expert testified that it was very unusual for a prepubertal child to lie about sexual abuse, because they do not have sufficient sexual knowledge to know how to describe such abuse unless they have experienced it. *Id.* 512 Pa. at 442, 517 A.2d at 921. Our Supreme Court stated that the testimony was essentially an inadmissible "expert opinion as to the veracity of the class of potential witnesses of which the victim was a member." *Id.*

*Baldwin* prohibited only direct testimony regarding the veracity of the witness or complainant. *Baldwin, supra* 348 Pa.Super. at 376–79, 502 A.2d at 257–258; *Davis, supra,* 518 Pa. at 81–82, 541 A.2d at 317. *Seese* expanded this prohibition to include expert testimony which commented on the veracity of a class of potential witnesses of which the victim was a member. *Seese, supra* 512 Pa. at 443–44, 517 A.2d at 922. The testimony in *Davis* was similar in many respects to that in *Seese.* Essentially, children do not fantasize about sexual experiences. *Davis, supra* 518 Pa. at 79–81, 541 A.2d at 316. Hence, there was expert testimony concerning the veracity of a class of individuals of which the particular witness was a member.[4]

In both *Seese* and *Davis,* our Supreme Court's *ratio decidendi* was the well-known proposition of law that the

4. *See also, Commonwealth v. Ferguson,* 377 Pa.Super. 246, 546 A.2d 1249 (1988), *alloc. denied,* 521 Pa. 617, 557 A.2d 721 (1989) (expert's statement that complainant's behavior and testimony were closely aligned with that of a child sexual abuse victim invaded province of jury since it was an expert assessment of the truthfulness of the child witness).

determination of the veracity of a witness is reserved exclusively for the jury. *Davis, supra,* 518 Pa. at 81–82, 541 A.2d at 317 (citations omitted); *Seese, supra* 512 Pa. at 443–44, 517 A.2d at 922 (citations omitted). The Court was concerned with the possibility that such expert testimony would encourage the trier of fact to abdicate its responsibility to ascertain the facts by deferring to an "expert." *Ibid.* In *Seese,* the Court stated "such testimony would imbue the opinions of 'experts' with an unwarranted appearance of reliability upon a subject, veracity, which is not beyond the facility of the ordinary juror to assess." *Seese, supra* 512 Pa. at 443–44, 517 A.2d at 922.

Since *Seese* and *Davis,* the authority of *Baldwin* has been continually eroded. In *Commonwealth v. Gallagher,* 519 Pa. 291, 547 A.2d 355 (1988), an expert testified that the victim suffered from "rape trauma syndrome" and that the victim's failure to identify her attacker two weeks after rape in one-on-one identification was unremarkable, and an in-court identification five years later was credible. Our Supreme Court held that the expert testimony on rape trauma syndrome should not have been admitted. *Gallagher, supra* 519 Pa. at 297–99, 547 A.2d at 359. The Court stated that the only purpose of the testimony was to enhance the credibility of the victim. *Id.,* 519 Pa. at 295–97, 547 A.2d at 358.[5] *Gallagher* sparked two dissenting opinions. The thrust of the first dissent was that the expert testimony should have been admitted to explain the apparently inconsistent conduct of the victim as:

> ... this information was beyond the ordinary training, knowledge, intelligence and experience of the ordinary juror and assisted the jury in assessing the testimony of the victim ...

*Id.,* 519 Pa. at 301, 547 A.2d at 360 (Larsen, J. dissenting). The second dissent argued that the expert testimony should have been allowed as a profile of the behavior of the class

5. *See also, Commonwealth v. Zamarripa,* 379 Pa.Super. 208, 549 A.2d 980 (1988) (introduction of opinion evidence of rape trauma syndrome to establish lack of consent is improper because lack of consent is issue for jury to decide).

of which the victim was a member to help the jury understand the victim's actions. *Id.*, 519 Pa. at 302–03, 547 A.2d at 361 (citations omitted) (Papadakos, J. dissenting).[6]

The erosion of *Baldwin* continued in *Commonwealth v. Emge*, 381 Pa.Super. 139, 553 A.2d 74 (1988), where an expert testified that alleged victim's post-attack behavior was consistent with behavior of victims of child sexual abuse. The *Emge* Court stated that *Seese* and *Davis* prohibited express testimony regarding the alleged victim's ability to verbally communicate the truth. It concluded that *behavioral testimony* equally invaded the exclusive province of the fact finder. *Emge, supra* 381 Pa.Super. at 145, 553 A.2d at 76 (emphasis in original). The Court concluded that testimony which matches the behavior of known victims of child sexual abuse with that of an alleged victim can serve no purpose other than to bolster the credibility of the alleged victim, and so is prohibited. *Id.* (citations omitted). *Emge*, therefore, treated indirect comment on the veracity of an alleged child sexual abuse witness/victim via testimony as to the behavior of typical victims as an invasion of the province of the jury. *See also, Commonwealth v. Higby*, 384 Pa.Super. 619, 559 A.2d 939 (1989) *alloc. denied*, 525 Pa. 978, 575 A.2d 109 (1990).

In *Commonwealth v. Gibbons*, 383 Pa.Super. 297, 556 A.2d 915, *alloc. denied*, 523 Pa. 647, 567 A.2d 651 (1989), an expert testified concerning the behavior patterns of child sexual abuse victims and the general dynamics of child sexual abuse. The expert did not attempt to compare alleged victim's behavior to that of known victims of child sexual abuse. *Id.* 383 Pa.Super. at 300, 556 A.2d at 916. Nevertheless, the Court, relying on *Emge*, concluded that the prejudicial value of the expert's testimony clearly out-

**6.** We note that the *Gallagher* majority's rejection of the profile evidence theory advanced by Justice Papadakos' dissent appears to reject the third and fourth approaches for the admissibility of this evidence argued for by the dissent. Dissent at 958–959. If evidence outlining the behavior profiles of rape victims is inadmissible, we fail to understand why behavior profiles of child sexual abuse victims should be admissible.

weighed its probative value. *Id.* *Gibbons*, in effect, prohibits any expert testimony on the typical behavior of child sexual abuse victims because of its prejudicial impact.

We stated in *Commonwealth v. Dunkle*, 385 Pa.Super. 317, 561 A.2d 5 (1989), *alloc. granted*, 524 Pa. 625, 574 A.2d 67 (1990), that upon review we must determine the purpose for which the expert testimony in question was offered; if that testimony was offered solely to sustain the credibility of the victim, the testimony should not have been admitted. *Id.* 385 Pa.Super. at 323–26, 561 A.2d at 8–9 (citations omitted). In *Dunkle*, as here, the victim delayed in reporting the offense, could not recall exact dates and times, and was inconsistent as to other details. *Id.* Expert testimony remarkably similar to that offered in the case at bar was held inadmissible as serving only to bolster the victim's credibility. *Id.*

Here, DeJong did not attempt to compare the alleged victims in this case with known sexual abuse victims he had interviewed. Nonetheless, as per *Emge* and *Gibbons*, the expert need not place the alleged victim in a class of known victims for his testimony to be inadmissible and an infringement upon the province of the jury. We have reviewed DeJong's testimony and we conclude that his testimony concerning the presence of delay, and the reasons why victims delay reporting incidents, was an attempt by the Commonwealth to legitimize the victims' delay in reporting the incidents. This testimony invaded the province of the jury and, in effect, attempted to have the jury adopt an expert's opinion that delay was a normal occurrence in two-thirds of all child sexual abuse cases, thus eviscerating the prompt complaint instruction. The Commonwealth's impermissible purpose, therefore, was to bolster the credibility of the victims.[7]

7. The dissent admits that the testimony's effect was to enhance the credibility of the victim's testimony. Dissent at 961–962. We see no substance to the distinction which the dissent apparently wishes to draw. To admit expert testimony outlining a victim profile, but not diagnosing the victim as qualifying as a member of the profile, would fly in the face of the *Gallagher* opinion. The *Gallagher* majority made

Jurors are human and may be unduly impressed by an expert, his credentials, and ultimately his opinion, "even though, upon reflection, they would realize that in the particular field under discussion they are as much at home as the expert." *Commonwealth v. Dillon*, 386 Pa.Super. 236, 245, 562 A.2d 885, 889, *alloc. granted*, 524 Pa. 595, 568 A.2d 1245 (1989) (citations omitted)[8]. Our Supreme Court has decided that this will not occur in Pennsylvania courts. *See, Seese, Davis*, and *Gallagher, supra*.

The Commonwealth argues that despite the above-cited authority, expert testimony which does not directly opine as to the veracity of a witness is permissible. The Commonwealth attempts to distinguish between testimony which centers on the psychological processes of the victim as opposed to that centering on the behavior patterns of victims, encouraging us to allow the latter.[9] As we noted above, this argument, whether characterized as profiling the typical behavior of a class of victims or as an attempt to explain behavior that is beyond the ordinary experience of

it clear that it was the *purpose* of enhancing victim credibility which was impermissible. *Gallagher, supra* 519 Pa. at 297, 547 A.2d at 358 (emphasis added).

8. We are puzzled by the dissent's criticism of this statement. Dissent at 957. Rape is as abhorrent as child sexual abuse; the treatises cited by the dissent would indicate that the behavior of rape victims is just as unusual as the behavior exhibited by victims of child sexual abuse; yet our Supreme Court had decided that the credibility of rape victims is "within the facility of the normal juror to assess." *Gallagher, supra* 519 Pa. at 297, 547 A.2d at 358 (footnote omitted).

9. The Commonwealth relies on *Commonwealth v. Pearsall*, 368 Pa.Super. 327, 534 A.2d 106 (1987), *alloc. denied*, 524 Pa. 596, 568 A.2d 1246 (1989) (expert opinion regarding the general behavior and psychological characteristics of child sexual abuse victims is permitted providing expert does not directly opine as to the victim's veracity); *Commonwealth v. Thek*, 376 Pa.Super. 390, 546 A.2d 83 (1988) (only expert testimony regarding the victim's credibility should be prohibited); and *Commonwealth v. Cepull*, 390 Pa.Super. 167, 568 A.2d 247 (1990) (generally allowing testimony as to Rape Trauma Syndrome in *dicta*). To the extent that these cases are inconsistent with today's reading of the relevant Supreme Court precedents, they are overruled.

The Commonwealth also cites numerous decisions from our sister states which allow the type of expert testimony at issue here. We, however, are bound by relevant Pennsylvania precedent.

jurors, was advanced in the dissenting opinions in *Gallagher*.[10]  *Gallagher, supra,* 519 Pa. at 297–305, 547 A.2d at 359–362 (Larsen, J. dissenting and Papadakos, J. dissenting).  The *Gallagher* majority implicitly rejected such distinctions by its decision.  We are not free to disregard their command.[11]

■  Our primary concern in these cases is to do justice.  To do so, we must maintain a difficult balance between society's interest in prosecuting criminals and a defendant's constitutional right to trial by jury.  Our Supreme Court has struck this balance by prohibiting expert testimony which passes on or enhances the victim's credibility.  *Seese, Davis,* and *Gallagher, supra.*  We are constrained to hold that expert testimony regarding the behavior patterns of the victims of child sexual abuse is inadmissible when offered to explain the conduct of the witness/victim in a case, as it tends to bolster the victim's testimony and so withdraw the issue of witness credibility from the jury.

**10.** Further, we cannot agree with the Commonwealth's characterization of DeJong's testimony.  DeJong testified as to the reasons why child sexual abuse victims delay in reporting the abuse.  Such testimony involves an examination of why the victims acted as they did, not just how they acted.  This attempts to address the victims' thought processes and is inadmissible.

**11.** The Commonwealth also cites to a recent Supreme Court decision, *Commonwealth v. Stonehouse,* 521 Pa. 41, 555 A.2d 772 (1989), which purportedly stands for the admissibility of this type of testimony because the behavior patterns of battered women are beyond the ordinary experience of jurors.  We note that the plurality opinion in *Stonehouse* overturns the conviction due to a failure of trial counsel to request an instruction requiring the jury to consider the cumulative effects of long-term abuse when assessing the reasonableness of a battered person's claim of self-defense.  *Id.,* 521 Pa. at 57–58, 555 A.2d at 781.  It was this reasoning, and not the discussion of the admissibility of expert testimony concerning battered women's syndrome, which commanded a majority of the court.  *See, Id.,* 521 Pa. at 66–67, 555 A.2d at 785 (Zappala, J. concurring).  As such, we cannot consider *Stonehouse* proper authority allowing us to deviate from the command of *Gallagher, supra.*

Judgment of sentence of the trial court is vacated, and appellant Garcia is granted a new trial. Jurisdiction is relinquished.

FORD ELLIOTT, J., files Dissenting Opinion in which DEL SOLE and HUDOCK, JJ., join.

FORD ELLIOTT, Judge, dissenting:

I must respectfully dissent. The majority's opinion has effectively driven the expert from the courtroom in cases involving the sexual abuse of children. This result was not mandated by precedent, but instead stems from the majority's misreading and misapplication of the holdings of our supreme court.

Significantly, the supreme court has never expressly overruled the opinion of this court in *Commonwealth v. Baldwin, supra.* Contrary to the majority's assessment, that court had the opportunity to overrule *Baldwin* in deciding *Commonwealth v. Davis, supra,* and instead the court, in a footnote, stated that *Baldwin* was disapproved only insofar as it conflicted with the *Seese* and *Davis* decisions. Therefore, I would find that *Baldwin* is still valid authority for the proposition that behavioral and psychological characteristics of child sexual abuse victims are proper subjects for expert testimony when such are relevant to an issue in the case and the expert's opinion does not assess or evaluate the credibility of the particular victim. I, therefore, would affirm the trial court's reliance on *Baldwin* for the admission of the expert testimony in this case, finding that *prompt complaint* was at issue and that the expert's testimony was highly relevant on that issue and did not offer an expert opinion on the veracity of the victim.

## THE CASE FOR EXPERT TESTIMONY

The standard in Pennsylvania for the admission of expert testimony as enunciated by Mr. Justice Flaherty in *Commonwealth v. Seese, supra,* is that, "[e]xpert testimony is

admissible in all cases, civil and criminal alike, when it involves explanations and inferences *not* within the range of ordinary training, knowledge, intelligence and experience." [1] 512 Pa. at 442, 517 A.2d at 921, (emphasis supplied) (citations omitted).

The use of expert testimony in child sexual abuse cases meets this criteria. The reason is simple. The immediate effects, long term impact and psychological trauma of sexual abuse on children are not, gratefully, matters within the common knowledge, information or understanding possessed by an ordinary juror. Not even a parent, who readily might recognize that a young child is exhibiting strange or unusual behavior, would associate such behavior with something as abhorrent as sexual abuse. How can we assume that jurors are vested with this understanding by virtue of their oath. Therefore, I take particular exception to the majority's conclusion that:

> [j]urors are human and may be unduly impressed by an expert, his credentials, and ultimately his opinion, even though, upon reflection, they would realize that in the particular field under discussion they are as much at home as the expert.

Majority opinion at 289 (citation omitted).

Expert testimony, which specifically addresses the psychological dynamics of sexual abuse of children and their behavioral patterns as victims, is vital in many cases. As discussed by Judge Beck in *Baldwin,*

> [t]he foregoing decisions support our conclusion that expert testimony such as that offered by Battinieri does not improperly invade the jury's prerogative. As one commentator has noted:
>
> > The argument that such psychological testimony is prejudicial because it bears on the credibility of a witness, and thus invades the province of the jury, is

---

**1.** This standard on the introduction of expert testimony is different from the federal standard which permits the testimony if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." F.R.E. 702.

simply wrong. Expert testimony cannot "invade the province of the jury" unless the jury is instructed that it must agree with the expert's assessment.

*Baldwin, supra,* 348 Pa.Super. at 376, 502 A.2d at 257.

There is a growing body of reliable scientific data to support the fact that the sexual abuse of children embodies psychological and societal components that are not generally within the common understanding and experience of lay observers. The nature of this abuse is often subject to myths and stereotypes. While a juror easily might comprehend that sexual abuse can have an impact on a child psychologically, a juror without some type of expert analysis, would not be able to understand the behavioral and psychological manifestations of this impact. As one commentator noted,

> [e]xpert psychological testimony concerning a defendant's sanity is often esoterically expressed in psychological jargon that is far removed from the common experience of the ordinary juror. By contrast, most types of nontraditional scientific evidence are much closer to the common understanding of the ordinary juror, yet, may fall beyond the common experience of jurors. Nontraditional psychological evidence often deals with circumstances that jurors probably suspect involve peculiar psychological consequences not associated with everyday existence. Yet jurors are without sufficient information to have any great insight into what those peculiar consequences might be.

McCord, *Syndromes, Profiles and Other Mental Exotica; A New Approach to the Admissibility of Nontraditional Psychological Evidence in Criminal Cases.* 66 Or.L.Rev. 19, 30–31 (1987).

Perhaps the most troublesome aspect of the majority's decision is that without regard to the content or purpose for which the expert testimony is offered, it finds any expert testimony on the behavioral or psychological dynamics of child sexual abuse inadmissible because it "bolsters the credibility of the victim," and thereby invades the province

of the jury. However, can it be denied that the use of expert testimony in any case will either bolster or impeach the testimony of other witnesses. As stated in *Baldwin,*

[t]he fact that the jury, if it believes the expert's testimony, may draw inferences which would tend to bolster the victim's credibility does not make the evidence inadmissible. It is a commonplace fact that the testimony of one witness may tend to corroborate another. Far from being improper, this is normal and is good trial strategy. (Much expert testimony will tend to show that another witness either is or is not telling the truth.... This, by itself, will not render evidence inadmissible).

*Baldwin, supra,* 348 Pa.Super. at 376–77, 502 A.2d at 257 citing *State v. Middleton,* 294 Or. 427, 657 P.2d 1215 (1983).

An application of the reasoning employed by the majority could result in the exclusion of expert testimony in many cases on the basis that its effect is to bolster, support or enhance the credibility of one witness or another. The following types of expert testimony are prime examples: (1) the expert who testifies in a drug possession case regarding the validity of the "drug courier profile" utilized by the arresting officer; (2) a medical expert who testifies that vaginal lacerations and adhesions are consistent with a complainant's version of a rape; (3) the psychiatrist who testifies in a rape case that a mentally retarded adult victim is incapable of forming consent; (4) the ballistics expert who testifies that an injury inflicted on a victim is inconsistent with the defendant's story of self defense; (5) the expert who testifies in a child abuse case that the injuries inflicted upon the victim could not be the result of an accident; (6) the expert who testifies regarding the effects of drugs or alcohol on a person fitting the defendant's weight and size as supporting the arresting officer's observations; and, (7) the expert who testifies regarding diminished mental capacity.

In the *Seese* and *Davis* decisions, the supreme court specifically disapproved, in this jurisdiction, the use of expert testimony which presumes to pass *directly* on the

veracity of a particular witness. Specifically, *Seese* prohibited the expert from evaluating the credibility of the victim, and *Davis* prohibited the expert from evaluating the veracity of the class to which the victim purportedly belonged. The *Seese* and *Davis* decisions carve out exceptions to the general principle that expert testimony is admissible in the prosecution of child sexual abuse cases. They adhere to the long established rule that an expert may not evaluate the testimony of witnesses as to credibility, for to do so would invade the province of the trier of fact. Such direct testimony on credibility supplants the jury's function. Justice Flaherty characterized the limited nature of the holding in *Seese*, when he stated:

> [a]lthough opinion evidence is not to be permitted on the issue of a witness' credibility, there remain, of course, all of the traditional methods for developing, or attacking a witness' credibility.

*Seese, supra* 512 Pa. at 444, 517 A.2d at 922.

This court, however, rather than adhering to the exceptions carved out by the supreme court, has instead, with broad strokes, obliterated the fine lines drawn by that court, and in effect, rendered inadmissible relevant, material, probative and scientific testimony of an expert merely because it supports the credibility of an alleged victim. I would suggest to the contrary that within the context of a child sexual abuse case, it may impede the function of the jury not to admit such testimony. To further provide perspective in this area, an examination of the role of the expert in child sexual abuse prosecutions is instructive.

## THE ROLE OF THE EXPERT

In analyzing the caselaw, one author has gleaned five basic roles which the expert may assume when testifying in a sexual abuse case.

> One jurisdiction permits the psychologist to testify as to the credibility of the child's testimony regarding the occurrence of the misuse and the identity of the offender. Because the child is likely to be a witness, the expert, in

effect, is employed to testify as to the credibility of another witness, the expert assuming the role of adviser to the jury on the weight that they should place upon the testimony before them. Commentators have identified this role as the liberal view, and one that has not been widely adopted.

Another approach permits the expert to testify regarding the results of a psychological evaluation of the child and to determine whether the psychological status of the child is consistent with having been subjected to sexual misuse by an adult. The evaluation itself may include a determination as to whether the child's behavior patterns are consistent with a syndrome or a diagnosis. This role is directly analogous to the approach taken by most courts with regard to the admission of testimony by a treating physician. The expert will identify symptoms of psychological injury and will report the behavior patterns observed during the examination of the child. Further, the expert will present a professional opinion as to whether these observations are indicative of a diagnosis or are consistent with the occurrence of a particular event. The expert thereby indirectly supports or impeaches the veracity of other witnesses.

A third approach calls upon the expert to present the behavior patterns and psychological symptoms associated with sexual misuse, without having evaluated the victim. The expert may respond to a hypothetical question that incorporates specific facts of the case. This role for psychological experts in child sexual misuse cases is a variation of the approach that many jurisdictions take with regard to traditional medical expert testimony. Rather than serve as a gatherer of facts, as in the second role discussed above, the expert applies scientific knowledge to either the hypothetical facts presented or to the facts admitted into evidence.

The fourth approach is similar to the third in that the expert does not evaluate the child. Under this scheme, the expert's testimony is restricted to a discussion of

general principles, leaving the application of these principles to the trier of fact. This approach is essentially an educational model, in which the expert's testimony educated the trier of fact.

The fifth and final approach allows the expert to present the child's testimony, which was elicited by the expert under reasonably controlled conditions and preserved. The expert may assist the court in the interpretation of the preserved testimony when its meaning is not self-evident. The expert thus assumes the role of preserver of perishable testimony—a role that has been assumed by the experts and accepted by the courts *sub silentio*. This is a necessary subcomponent of the second role identified above. The clinical expert must elicit the child's verbal and nonverbal behavior in order to evaluate the child. For this evaluation to be meaningful, the methods and conditions must be reasonably controlled. As presently conducted, however, this testimony is most often preserved in a haphazard fashion, subject to the need of the evaluator to support the evaluation.

Note, *The Admissibility of Psychological Testimony in Cases Involving the Sexual Misuse of a Child*, 42 U.Miami L.Rev. 1033, 1040–1042 (1988). *See also,* Note, *Expert Testimony in Child Sexual Abuse Prosecutions: A Spectrum of Uses*, 68 B.U.L.Rev. 155 (1988).

These roles represent examples of the varied content and purpose for which expert testimony might be offered in the trial of a sexual abuse case, and they also help to illustrate the limited nature of the *Seese* and *Davis* holdings. Our supreme court in these cases has prohibited the use of an expert, no matter what role that expert may assume, from assessing a witness' ability to tell the truth.

## THIS COURT'S EXTENSION OF *SEESE* AND *DAVIS*

Recognizing that *Seese* and *Davis* dealt with express testimony regarding the alleged victim's ability to *verbally* communicate the truth, the superior court has gone further and held that expert testimony on the behavioral dynamics

of sexual abuse *equally* invades the province of the fact-finder.

In cases where lay witnesses, perhaps a parent or teacher, were permitted to take the stand and testify as to the child's change in behavior following an alleged incident of abuse, the expert was prohibited from pulling together the behavioral testimony of the lay witnesses and giving the jury some correlation or assessment of the questioned behavior. *Commonwealth v. Emge, supra; Commonwealth v. Higby, supra.*

In *Commonwealth v. Gibbons, supra,* this court agreed with the trial court that the expert's testimony was "relevant and probative in that the jury could infer that gaps and inconsistencies in the victim's testimony stemmed from the psychological dynamics of incest rather than from fabrication or fantasy." *Id.* 383 Pa.Super. at 299, 556 A.2d at 916. This court went on to point out that, unlike in *Emge, supra,* the psychologist *did not* testify that the accusing child's behavior matched the behavior of known victims of sexual abuse. Nevertheless, citing *Emge,* the court concluded that the probative value of the expert's testimony clearly was outweighed by the prejudicial impact of admitting it. No further explanation was given for this conclusion.

In *Commonwealth v. Dunkle, supra,* a case very similar to the instant case, this court held that, where the child delayed in reporting the incident and failed to recall certain details of the alleged abuse, her testimony must stand alone before the jury, even though she may not be able to explain her behavior. The court determined that any attempt to introduce expert testimony, which dealt with the fact that children, sexually abused, sometimes delay in reporting the incident and sometimes are unable to recall exact dates and times because of the trauma associated with the event, is in violation of the *Seese* and *Davis* holdings. To admit such behavioral testimony, the court reasoned, would thereby allow the jury to accept the victim's version of the facts. *Dunkle, supra,* 385 Pa.Super. at 325–26, 561 A.2d at 9.

This line of decisions tacitly, has eliminated the use of expert testimony in abuse cases no matter in what form or for what purpose it is offered. It has lumped all types of such testimony into one category, leaving the prosecution, defense counsel, and the trial court without any guidelines for determining admissibility. I would be inclined to agree with my colleagues on the inadmissibility of such testimony if the objections were grounded more soundly on relevancy or on the particular use of, or necessity for, such testimony at trial or on the qualifications of the expert or even the validity of the research data. Absent such objections, however, the jury is entitled to the evidence.

Moreover, the introduction of such expert testimony offered in child sexual abuse cases is always subject to cross examination, impeachment, and cautionary instructions.[2] These are the protections afforded to a defendant to insure that the proper weight is given to any expert testimony by the jury.

## THE IMPACT OF *GALLAGHER*

The majority would argue that the supreme court's decision in *Commonwealth v. Gallagher, supra,* has extended that court's *Seese* and *Davis* holdings now to prohibit all expert psychological syndrome testimony including testimony regarding the behavioral patterns of sexual abuse victims on the basis that such testimony bolsters the credibility of the victim.

I admit to some difficulty in denying that the supreme court's treatment of the rape-crisis syndrome in *Gallagher* might have application to other types of syndrome testimony including the child sexual abuse accommodation syn-

---

2. *See* Miller, *Cross–Examination of Expert Witnesses: Dispelling the Aura of Reliability,* 42 U.Miami L.Rev. 1073, (1988); Goldstein, *Psychiatrists on the Hot Seat: Discrediting Doctors by Impeachment of Their Credibility,* 16 Bull.Am.Acd.Psych.L. 255, 225–34 (1988); and Note, *The Unreliability of Expert Testimony on the Typical Characteristics of Sexual Abuse Victims,* 74 Geo.L.J. 429, (1985).

drome.[3]  As discussed by Judge Tamilia in his dissent in *Commonwealth v. Smith*, 389 Pa.Super. 626, 567 A.2d 1080 (1989), a syndrome is a collection of symptoms, the manifestation of which may vary from case to case.  A syndrome does not represent a diagnosis and therefore its use as substantive evidence of the occurrence of a particular event is always subject to scrutiny.[4]

In *Gallagher*, the expert testified that she examined the victim and diagnosed the victim as suffering from rape trauma syndrome.  She further testified that she believed the syndrome affected the victim's ability to identify the assailant.  The supreme court determined that this testimony improperly enhanced the victim's credibility in the eyes of the jury which was impermissible.  *See Commonwealth v. Cepull, supra,* wherein *Gallagher* is distinguished on this basis.  However, the court, specifically declined to reach the issue of whether evidence on rape trauma syndrome was sufficiently reliable to be admissible generally.  Considering once again the roles of an expert which were reviewed earlier, the holding in *Gallagher* appears to do no more than assail the use of an expert to offer syndrome testimony as clinical diagnosis.  In effect, the second approach to the role of an expert which permitted the testimony of the expert regarding the results of a psychological evaluation and the determination of whether the psychological status of the victim is consistent with having been subjected to the rape trauma has now been disapproved in this jurisdiction.  The issue of whether an expert may testify generally as to behavior patterns and psychological symptoms associated with rape trauma syndrome when offered for another purpose was not decided by *Gallagher*.  I consider this conclusion borne out by the supreme court's

3.  *See* Summit, "The Child Sexual Abuse Accommodation Syndrome"; 7 Child and Neglect 177 (1983) wherein the syndrome sets out five characteristics commonly observed in sexually abused children: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, conflicted and unconvincing disclosure; and, (5) retraction.

4.  *See Expert Psychological Testimony, supra;* McCord, *supra. See also* Boreski, *Syndrome Testimony in Child Abuse Prosecutions: The Wave of the Future,* 8 St.Louis U.Pub.L.Rev. 207 (1989).

treatment of another psychological profile type—the battered woman syndrome in *Commonwealth v. Stonehouse*, 521 Pa. 41, 555 A.2d 772 (1989). While I agree with the majority that the result in *Stonehouse* was the grant of a new trial based on ineffective assistance of counsel in failing to request an adequate jury instruction, there is little question that the lead opinion authored by Justice Larsen, and joined in by Justice Papadakos and former Justice Stout, would have found counsel ineffective for failing to present expert testimony on the battered woman syndrome. Justice Zappala in his concurrence joined in by Justice McDermott, while choosing not to reach that issue stated the following:

> [a]lthough the issue was addressed by amici, the appellant has made it clear that appellant's position on the self-defense issue is not to be mischaracterized as a failure to raise the 'battered woman syndrome' issue. While I recognize the import of this issue, I believe its resolution is best left to a time when the issue is squarely before us.

*Stonehouse, supra,* 521 Pa. at 66–67, 555 A.2d at 785. There is nothing in the majority or concurring opinion which would have precluded defense counsel on remand from offering expert testimony on the battered woman syndrome in defense of the case, and in fact three members of the court already had found prior counsel ineffective for not doing so.[5] In the interests of justice and judicial economy, if *Gallagher* so clearly forbade the introduction of psychological profile testimony under all circumstances then surely one of the justices of our supreme court would have so indicated. Having stated thus, if an adult defendant has the right to have a psychological condition explained to the jury by an expert, what logic deprives a child victim of this same opportunity to have her story heard. The injustice worked by the majority's holding today is further highlighted by the notion that a defendant now might offer the very same expert testimony, which we preclude the prosecution

5. We note that on remand, defendant *Stonehouse* was acquitted following a bench trial.

from introducing, to establish that his actions were the result of his own experience of having been victimized by sexual abuse as a child.

## THE TESTIMONY OF DR. DEJONG

Turning to the role of the expert in the instant case and examining the nature of his testimony and the purpose for which it was offered, I would find Dr. DeJong's testimony to represent one of the purest examples of the proper use of expert testimony in an abuse case.[6] And I readily would admit that the effect of the testimony was to enhance the credibility of the victim. As discussed by the majority, Garcia relied upon the alleged victim's delay in reporting the abuse as a central element of his defense. Counsel engaged in extensive cross-examination of the victim to highlight this fact and in its closing to the jury the defense vigorously argued the delay issue. Prompt complaint was an issue for the jury to consider in assessing and weighing the testimony of the child victim. Thus, the trial judge instructed the jury:

> [a]nother aspect of sexual assault cases concerns what is known in the trade as prompt complaint.
>
> Again there used to be reasonings and philosophies years ago that because of a particular heinous nature a sexual assault is the type of incident that immediately demanded an outcry from the person who was the alleged victim. Hence, the development of a theory called prompt complaint.

Notes of Testimony, N.T., 10/16/87 at 123–124. Obviously, the jury is entitled to all available information in confronting this issue. The trial judge, therefore, properly permitted the statistical testimony of Dr. DeJong to be considered by the jurors in order to aid them in following his instructions that "delay or failure to make prompt complaint are factors bearing upon the believability of ['the witnesses'] testimony and must be considered by you in light of all the

6. The form of this testimony might be the subject of either the third or fourth approach discussed.

evidence in the case." *Id.* at 126. I cannot agree with the majority that Dr. DeJong's testimony was the same as that prohibited by the supreme court in *Seese, Davis* or *Gallagher.*

Following the victim's testimony, Dr. DeJong, a pediatrician with expertise in sexual abuse, testified to the possible reasons for the lack of physical trauma to the victims. This was one of the issues the jury had to confront. He further testified as to the statistics he compiled as Director of the Pediatric Sexual Assault Follow–Up Program at Jefferson Hospital. These statistics showed varying delays between the time that the alleged sexual abuses occurred and the time when they were reported. Some children reported alleged sexual abuse immediately, others delayed. He did not, however, offer an opinion as to the accuracy or validity of the complaints he recorded.

The majority holds that this expert testimony was improper in that it was an attempt by the Commonwealth to have the jury adopt an expert's opinion that delay was a normal occurrence in sixty-six percent of child sexual abuse cases. This is not quite accurate. Dr. DeJong did not render an opinion as to what was normal or abnormal in sexual abuse cases. He testified that two-thirds of the children who reported alleged incidents of sexual abuse did so at least twenty-four hours after those alleged incidents occurred. He did not attempt to interpret those statistics for the jury nor attach any significance to them.

Additionally, such testimony was not being offered to establish the occurrence of a fact of consequence, but rather to assist the trier of fact in weighing the probative value of a circumstantial fact. One commentator has explained,

[t]he purpose of an expert's testimony with respect to scientific information is to provide information that is beyond the common experience of the trier of fact and that will assist it in the determination of the probative value to be assigned to a circumstantial fact that bears upon a fact of consequence. An example is a child's

postponing disclosure of the sexual misuse for a period of months or years. A juror is likely to be incredulous upon hearing a defense attorney elicit from the prosecution's chief witness, the child victim of misuse, that the child delayed for an extended period of time before reporting the abuse to anyone. Common experience teaches us that when a child suffers an injury the child will tell an adult almost immediately. Therefore, testimony of delay in reporting an abusive event would serve as an indirect impeachment of the child's veracity. The prosecutor may call an expert to address this perception. The expert will testify that a delay in reporting an incident of sexual misuse is a common occurrence among victims of sexual assault. The defendant, through his elicitation of testimony regarding delay in the reporting of the incident of sexual misuse opened the door to the admission of the prosecution's expert testimony. The defendant placed in issue the proper interpretation of the elicited circumstantial fact: Whether there exists a stronger correlation between delay in reporting and fabrication than between delay in reporting and telling the truth. The expert's role in such a case is to provide an opinion, based upon both the statistical studies and their own clinical experience with patients other than the victim, as to which correlation has more merit.

*Expert Psychological Testimony, supra* at 1055–1056.

The use of expert testimony in this manner has been approved in numerous other jurisdictions.[7] As suggested

7. The cases are catalogued in *Smith, supra,* Dissenting Opinion by Tamilia J. at Note 4, as follows:

4. *See, e.g., State v. Davis,* 422 N.W.2d 296 (Minn.Ct.App.1988) (court approves expert testimony to inform jury that running away from home is common in sexually abused adolescents); *State v. Bailey,* 89 N.C.App. 212, 365 S.E.2d 651, 655 (1988) (expert could state why child would continue to cooperate with abuser); *People v. Bowker,* 203 Cal.App.3d 385, 249 Cal.Rptr. 886, 891 (1988) (child sexual abuse accommodation syndrome testimony admitted to explain delay); *People v. Hampton,* 746 P.2d 947 (Colo.1987) (adult rape victim; rape trauma syndrome admitted to explain delay); *Wheat v. State,* 527 A.2d 269 (Del.1987); *People v. Matlock,* 153

by one writer, such testimony has an important and relevant place in the courtroom:

[t]he defense in child sexual abuse cases often highlights some unusual aspects of the victim's behavior. These aspects typically include delays in reporting, inconsistent and partial disclosures, and recantations. The defense generally raises these issues during cross-examination of the victim, or perhaps during cross-examination of other state witnesses such as police officers or child protective service workers. This type of cross-examination is often very effective if the prosecutor does not take steps to rehabilitate these witnesses. Jurors often do not understand the dynamics of a sexually abusive relationship. They do not understand that children usually do not report sexual abuse immediately. In addition, any partial disclosure or recantation mentioned by the defense gives credence to the view, held by many prospective jurors, that children fabricate stories of sexual abuse.

When faced with this type of defense, the prosecutor should consider using expert testimony either in the case in chief, or in rebuttal. This form of testimony is fundamentally different from the expert diagnosis of child sexual abuse syndrome referred to earlier in this article. The testimony of an expert in this context is more general, and is designed to provide the jury with an analytical framework within which to evaluate the child victim's testimony. In essence, the testimony is being offered to show that the victim's behavior, while appearing to be inconsistent, may in fact be consistent with sexual abuse. However, the expert in this case is not being asked for an opinion about whether the specific child in this case is an abused child.

Mich.App. 171, 395 N.W.2d 274, 277 (1986); *State v. Sandberg,* 406 N.W.2d 506, 511 (Minn.1987); *Smith v. State,* 100 Nev. 570, 688 P.2d 326, 326–27 (1984); *People v. Benjamin R.,* 103 A.D.2d 663, 481 N.Y.S.2d 827, 831–32 (1984); *State v. Hicks,* 148 Vt. 459, 535 A.2d 776, 777 (1987); *State v. Petrich,* 101 Wash.2d 566, 683 P.2d 173, 179–80 (1984); *Scadden v. State,* 732 P.2d 1036, 1046 (Wyo.1987). *See also, Duckett v. State,* 797 S.W.2d 906 (Tex.Cr.App.1990).

Prosecutors have successfully admitted testimony from experts on the subject of delayed and incomplete disclosure. For example, in *People v. Dunnahoo* [152 Cal. App.3d 561], 199 Cal.Rptr. 796 (Cal.Ct.App.2d 1984), the defense pointed out that the two victims did not immediately tell the police about the acts committed on them by the defendant. The prosecution then used two police officers, qualified as experts in the field of child molestation, who testified that sexually molested children find it quite difficult to talk about sexual abuse. The appellate court held that this was appropriately admitted expert testimony. Similarly, in *People v. Benjamin, R.* [103 A.D.2d 663], 481 N.Y.S.2d 827 (1984), the court approved the admission of expert testimony concerning why a victim of sexual abuse is often reluctant to reveal the crime, particularly if it occurred in a family setting. The court pointed to the fact that the defense raised the issue of delayed reporting during the cross-examination of the victim. Moreover, the court noted that the testimony was of a general nature and did not amount to an expert opinion that in fact this specific child was a victim of molestation. In *State v. Middleton* [294 Or. 427], 657 P.2d 1215 (Ore.1983), prosecutors successfully admitted expert testimony that sexual abuse victims often recant their original disclosure.

The prosecutor should be on firm ground in offering this testimony, as it is admissible in most states. The expert should be counselled by the prosecutor prior to trial not to opine that the specific child is a victim of molestation. Testimony from experts that delays in reporting, incomplete disclosures, and recantations are not inconsistent with abuse should provide the jury with an appropriate knowledge of the dynamics of child sexual abuse. As one commentator has noted, the prosecution's use of expert testimony in this way is in keeping with the theory of expert witness rules and facts. See R. Roe, 'Expert Testimony in Child Sexual Abuse Cases,' from Papers from a National Policy Conference on Legal Re-

forms in Child Sexual Abuse Cases, American Bar Association, (1985).

Gardner, *Prosecutors Should Think Twice—Before Using Experts in Child Abuse Cases*, 3 Crim.Just. 12, 15 (1988).

## CONCLUSION

Admittedly, the views expressed in this dissent are not new. Rather, they have been expressed previously by other members of this court with great clarity and eloquence. *See Commonwealth v. Purcell*, 403 Pa.Super. 342, 589 A.2d 217 (1991), (Dissenting Opinion by Beck, J.); *Commonwealth v. Cepull, supra*, (Opinion by Tamilia, J.); *Commonwealth v. Dunkle, supra*, (Kelly, J. dissenting); *Commonwealth v. Thek*, 376 Pa.Super. 390, 546 A.2d 83 (1988) (Opinion by Kelly, J.); *Commonwealth v. Smith, supra*, (Dissenting Opinion by Tamilia, J.); *Commonwealth v. Pearsall*, 368 Pa.Super. 327, 534 A.2d 106 (1987), (Opinion by Kelly, J.); and, *Commonwealth v. Emge, supra*, (Dissenting Opinion by Brosky, J.).

The admissibility of non-traditional psychological evidence is a new and uncharted evidentiary area in many jurisdictions. Hence, the strong advocacy by several members of this court that we proceed at a more measured and calculated pace in defining admissibility standards for such evidence.[8] Certainly, such an effort would benefit far more from a review on a case by case basis, rather than, at this early date, the establishment of blanket prohibitions.[9] This is particularly so since our supreme court's rulings on the admissibility of such evidence have not been as sweeping.

Without question, expert testimony on the behavior patterns and psychological dynamics of sexual abuse victims can be very prejudicial. While, we have a grave responsibil-

---

8. *See Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), defining admissibility standards for "new" types of scientific data and *United States v. Downing*, 753 F.2d 1224 (3rd Cir.1985) establishing a three prong test for the admissibility of expert testimony on the reliability of eyewitness identification.

9. *Commonwealth v. McNeely, supra*, in which expert testimony was found inadmissible as not relevant in that the panel was unable to discern the purpose for which testimony was offered.

ity to address the many legitimate concerns regarding the use of expert testimony in this area, we also must not ignore its tremendous benefits to the truth determining process. This responsibility becomes all the more critical when such expert testimony is offered to aid the trier of fact in cases involving society's most vulnerable victims, our children. If we can determine on sound evidentiary grounds, that expert testimony is reliable, relevant, material and probative, can we afford to keep it from the jury in a case of child sexual abuse. Should not our inquiry be focused more on weighing the probative value of such testimony against its prejudicial impact in any given case.

I agree with the majority that our primary concern is to do justice. But a necessary part of that mandate involves providing a jury with the best possible evidence to allow it to decide a case correctly. Undeniably, there is presently a climate of hysteria in our society which makes the possibility of false accusation a matter of grave concern. Therefore, for the protection of both the accused and the child, the Commonwealth must be required to exercise its discretion with great caution when deciding whether to prosecute such cases. However, once the decision to prosecute is made, we must not abandon the child in the courtroom.

DEL SOLE and HUDOCK, JJ., join.