599 A.2d 172

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. J.Q., DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted May 1, 1991—Decided November 14, 1991.

Before Judges KING, LONG and STERN.

*Wilfredo Caraballo*, Public Defender, attorney for appellant (*Amy Gershenfeld Donnella*, Designated Counsel, of counsel and on the briefs).

*Robert J. Del Tufo*, Attorney General, attorney for respondent (*Cherrie Madden Black*, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

LONG, J.A.D.

I

We are called upon here to determine the extent to which expert evidence may be utilized in a child sex abuse case to

shore up a victim-witness's testimony. Defendant, J.Q., who was convicted of a series of sex crimes against his young daughters, N.Q. and C.Q., claims that he was denied a fair trial because of the improper admission of expert testimony which bolstered the credibility of the children.[1] At issue is the admission of testimony as to the Child Sexual Abuse Accommodation Syndrome (CSAAS), other so-called syndrome evidence and expert opinion that the children's statements that they had been sexually abused were truthful.

We hold that CSAAS evidence is generally reliable to explain secrecy, belated disclosure and recantation by a child sex abuse victim; that syndrome evidence, including CSAAS, is not reliable to prove the occurrence of sexual abuse, and that absent a question of capacity, a social science expert lacks the qualifications to render an opinion as to the truthfulness of a statement by another witness. Because the expert in this case testified before the jury as to syndrome evidence to prove that sex abuse occurred; opined as to the truthfulness of the children (and their mother), and rendered the opinion that the children were abused based in great measure upon these two interdicted classes of evidence, we are satisfied that the admission of her testimony was error clearly capable of producing an unjust result.[2] We thus reverse and remand the case for a new trial. In this opinion, we will attempt to distinguish between admissible and inadmissible expert behavioral science evidence in a child sexual abuse case.

---

[1] He also contends that the trial judge denied him his Sixth Amendment right to confrontation by allowing N.Q. and C.Q. to testify on closed circuit television; that a stipulation as to the expert testimony was improperly related to the jury; that one of the experts, Dr. Bresnahan lacked qualifications to give expert testimony in any field; that the sentence imposed was improper; that the record of the case was not adequately preserved, and that he was denied effective assistance of counsel.

[2] Because defendant did not object to the expert testimony at trial, this is the applicable standard. *R.* 2:10-2.

## II

After a jury trial, defendant was convicted on count one of Essex County Indictment No. 3069-7-87 of first-degree aggravated sexual assault upon his daughter, C.Q., then seven years of age,[3] by vaginal penetration, contrary to the provisions of *N.J.S.A.* 2C:14-2a(1). On count two, defendant was convicted of fellatio upon C.Q.—also first-degree aggravated assault— contrary to *N.J.S.A.* 2C:14-2a(1), and on count three, of sexual conduct which would impair or debauch the morals of C.Q., while defendant had a legal duty of caring for her, in violation of *N.J.S.A.* 2C:24-4. On counts four, five, six and seven, defendant was convicted of having committed aggravated sexual assault upon his daughter, N.Q., then six years of age,[4] by vaginal penetration, anal penetration, fellatio and cunnilingus, all contrary to the provisions of *N.J.S.A.* 2C:14-2a(1). On count eight, defendant was convicted of engaging in sexual conduct which would impair or debauch the morals of N.Q., while he had a legal duty of caring for her, in violation of *N.J.S.A.* 2C:24-4. Defendant received an aggregate custodial term of 30 years with ten years of parole ineligibility. An appropriate Violent Crimes Compensation Board Penalty was also imposed.

## III

Defendant lived with C.W. for approximately nine years. Although they never married, they had two daughters: C.Q. born in 1977, and N.Q., born in 1979. Throughout 1984, the time period covered in the indictment, defendant and C.W. lived with their two daughters in an apartment in Newark, New

---

[3]While the indictment stated that C.Q. was seven at the time of the crime, her trial testimony and the statements of the prosecutor at trial indicate that she was six during at least part of 1984. She was ten when she testified in May 1988, and her birthdate was not given.

[4]As with C.Q., the indictment apparently did not note N.Q.'s correct age at the time the offenses were committed: she testified, and the prosecutor indicated, that she was four to five years old during 1984.

Jersey. The parties separated in late 1985 or early 1986. C.W. married "Carlos" in 1985, and defendant has also married since the separation.

Like their separation, the parties' relationship was acrimonious and even violent—both parties testified that defendant frequently hit C.W. In 1977, defendant had an affair, and C.W. surprised defendant and his paramour in the family apartment. C.W. beat up the woman friend, hit defendant, and according to him, told him she would "make him pay."

Defendant and C.W. apparently separated one or more times before the final breakup—in December 1984—according to C.W. because defendant was "fooling around." Defendant went to Puerto Rico to visit his family. When he returned, C.W. was pregnant, and they argued about whether the child was his. Defendant's suspicions were confirmed when C.W. testified at trial that J., born in 1985, was not defendant's child.

The parties finally separated at the end of 1985 or the beginning of 1986, after defendant found C.W. in their apartment with another man. Defendant and C.W. battled until the end. For example, N.Q. and defendant both described an incident where defendant returned to the apartment and hit C.W. in the stomach with a hammer. When he dropped the tool, C.W. retrieved it, and hit him on the head with it.

Despite the stormy relationship between defendant and C.W., defendant continued to see his daughters from the time of the separation until "sometime in 1987" when allegations about sexual misconduct came to light. For a while, defendant took the girls to his apartment in New York every weekend, although the frequency of these visits eventually dropped off and according to C.W., defendant came only "when he felt like it." C.W. explained that she never wanted to keep her daughters away from their father because she had never known her father and did not want the same to happen to N.Q. and C.Q. Indeed, there was some testimony that C.W. insisted that defendant assume some responsibility for N.Q. and C.Q. De-

fendant stated that once C.W. came to his apartment to ask why he did not visit the girls. He said she insisted that he take them for the weekends because she was young and needed to go out.

These visits came to an end when N.Q. and C.Q. disclosed that defendant had committed sexual acts with them. These allegations surfaced "sometime in 1987." C.W. was in her bedroom watching television, and her three daughters were in their bedroom playing, when she heard a loud slap. Her youngest daughter had slapped N.Q. and left a mark on her face. N.Q. was on her knees kneeling over J., and while C.W. at first thought they were just playing "horsey back riding," J.Q. was crying and said N.Q. tried to pull down her panties and touch her "butt." C.W. asked N.Q.: "who told you to pull someones [*sic*] panties [?]." At first N.Q. did not want to say but then she stated that "it starts with d," and finally she said it was d-a-d. C.W. asked her if she meant her stepfather or her real father, and N.Q. replied her father. C.Q. then added that her father did things to her too but they did not want to tell because he threatened to hurt C.W. C.W. told the girls that it was important not to lie and they denied that they were lying. C.W. asked them to use a baby doll to show what had happened to them, and after this she was convinced that they had been sexually abused. C.W. eventually took the children to her doctor, and then to the Division of Youth & Family Services. C.W. also testified that before these disclosures she had noticed that N.Q. had a vaginal discharge, but had attributed it to the child not changing her panties.

N.Q. and C.Q. both testified at trial, in the judge's chambers, via closed-circuit television broadcast into the courtroom. N.Q. was eight years old and in second grade when she testified in May 1988. She responded "yes" to the question as to whether she was four or five years old back in 1984, and also replied "yes" when questioned whether there "came a point in time where your daddy did things that you didn't like?" She then related that "[h]e put his d-i-c-k in my vagina." By "d-i-c-k" she

said she meant his "private parts." She said that this hurt a "little bit." He put his "d-i-c-k" in her mouth also, and "milk" came out of it. In response to whether he ever put anything on his d-i-c-k, she replied that when he was living with her mother he put some kind of chocolate syrup on it and made her lick it off. She also stated that he "french kissed" her, which she described as "when the guy puts the tongue into a woman's mouth." He also put his mouth on her vagina and licked her and put his d-i-c-k in her butt, which hurt her. He also put his finger in her vagina and moved it around. N.Q. stated that he did these things to C.Q. also, and that C.Q. saw him when he did them to her. The incidents occurred while defendant lived with them and their mother, but when her mother was out of the apartment. (At one point, N.Q. also stated that these incidents occurred when she and C.Q. visited defendant in Brooklyn.) She explained that she was not allowed to tell her mother about what was happening because she was afraid her father would hit her and C.Q. and her mother. N.Q. said that she would never lie and that, while she was mad at her father, she had loved him very much before he started doing these things.

C.Q., age ten at the time of trial and in fourth grade, also stated that defendant did things to her and her sister N.Q. which they did not like. "He put his hot dog in our private place." He put it in "a lot" and it hurt "a little bit." He also put his penis in her "back part" and this hurt. He put chocolate syrup on his penis and put it in N.Q.'s mouth. Sometimes he would tell one of them to put her mouth on his penis, and he would put his mouth on the vagina of the other. She and N.Q. never told their mother about these acts because they were afraid they would get in trouble and that defendant would hit them.

C.Q. stated that after defendant left their apartment to live in Brooklyn, she and N.Q. would go to visit him. They wanted to see him because they loved him, but sometimes he made them go and would give them an "evil look" when he picked them up.

She insisted, in the face of cross-examination, that her mother did not force her to tell this "story" about her father.

During cross-examination of N.Q. and C.Q., the defense tried to establish that they might have been exposed to sexual activity other than through defendant. For example, N.Q. acknowledged that she sometimes saw the boys in her apartment do "nasty" things to girls in the hallways, and she once saw a boy kissing C.Q. in the basement. C.Q. explained that once her mother sent her out of the room when a movie came on with "nasty things" in it. The movie showed a man putting his penis in a woman's vagina. She remarked that Carlos usually put an "x" on some movies when he brought them home, but this time he did not.

Dr. Karen Bresnahan, a pediatric resident at the University of Medicine and Dentistry of New Jersey, testified that she had examined N.Q. Bresnahan stated that she had previously examined between 30 and 50 child abuse victims. Bresnahan reported that N.Q.'s hymenal opening was stretched, but there were no lacerations and no evidence of blood or puss. She reported that it was not normal for a child to have a stretched hymen, and explained that the hymenal opening is usually about four millimeters. While she did not record how much N.Q's. hymen was stretched beyond this, she opined that her finding "makes one suspicious" that there had been some type of manipulation consistent with sexual abuse. The stretching she observed could result from penetration by penis or finger, although it is possible that a girl could be born either without a hymen or with one with a larger opening than average. The condition could not result from strenuous activity. On the other hand, Bresnahan opined that it is possible that a stretched hymen would be the only physical evidence of penetration by an adult male on a six or seven-year-old girl. Bresnahan concluded that N.Q. had been sexually abused, both because of the physical examination and because N.Q. had told her she had been abused. No medical testimony was presented with respect to C.Q. The parties stipulated that a Dr. Haratounian

had examined C.Q. and found that she also had a stretched hymen.

Dr. Madeline Milchman, a Ph.D in clinical psychology, interviewed both C.Q. and N.Q. each for a period of approximately an hour and one-half. She was trained in child sex abuse, has taught psychology at Rutgers, and has published articles on how to determine whether child abuse has occurred. She chairs a subcommittee of the New Jersey Psychological Association which is devoted to conducting research into objective criteria for assessing whether or not a child is making a valid allegation of child sexual abuse. According to Milchman, such objective criteria is being tested in "pilot" cases.

Milchman stated that approximately one-third of her practice "consists of children who have [been] alleged to have been sexually abused." In the course of her training, Milchman became familiar with CSAAS, a pattern of behavior "found to occur again and again in children who are victims of incest." According to Milchman, it has five components:

[A] pattern of behavior that is found to occur again and again in children who are victims of incest and there are five parts to that. The first part of the pattern is that the children tend to keep the incest a secret. Most people would expect that a child would tell if they had been sexually assaulted but in fact they tell very rarely. Usually the child will keep it a secret and will keep it a secret for a very long period of time.

The second part of the pattern is helplessness and that has to do with why the child keeps it a secret.... The third part is entrapment and accommodation and what that means is that the child gets trapped, the child feels helpless, the child is told to keep it a secret. They have been threatened they are afraid that the parent would not love them any more. The parent has more power than the child.... And for that reason they will go along for years and years and years without ever making any disclosure to anybody. What the child does is to accommodate the abuse. That means they adjust to it.

. . . .

A disclosure is usually very delayed and it comes because of something external that has revealed the pattern. That's the fourth part, the delayed disclosure. And the last part, the fifth part of the pattern is that sometimes the child can go back on it, they will say no I made it up and that's not true and they will give up.... And those are the five parts of the Sex Abuse Accommodation Syndrome.

Milchman concluded that N.Q. suffered from the first four symptoms of CSAAS—secrecy, helplessness, accommodation and delayed disclosure and was a withdrawn child. The only symptom she did not show, according to Milchman, was recantation. Milchman stated that C.Q. also exhibited the first four symptoms of CSAAS although her overt reactions were more outgoing and brash than those of N.Q.

Milchman stated that some child sex victims become withdrawn while others are more aggressive and that other outward signs of sexual abuse are "behavior syndromes of trauma, nightmares, falling grades in school, fights with other children, aggression, withdrawal, crying episodes for no apparent reason or for flimsy reasons, any kind of sign of stress, such as anxiety." She related that N.Q. experienced crying, nightmares and falling grades.

Milchman testified that the childrens' recitation of the events was consistent with sexual abuse because of its detail. She explained that descriptions of their "father's" acts of moving his finger in N.Q.'s vagina, and "french kissing," cannot be learned from watching an X-rated movie or from the "general culture" and that the chocolate syrup story was the type of "concrete, realistic detail" that supported the truthfulness of the allegation.[5]

As to the method she uses to assess the credibility of child witnesses, Milchman stated:

> One of the things that is very important to look at, in order to tell whether a child has been sexually abused or not when they are saying it is whether the

---

[5]In 1989, *Evid.R.* 63(33) was enacted to allow detailed testimony of an out-of-court statement by a child victim of sexual abuse to be related to a jury if the child testifies and the statement is found to be trustworthy. At the time of this trial, N.Q. and C.Q.'s out-of-court statements to Dr. Milchman were inadmissible under existing exceptions to the hearsay rule. *State v. D. R.*, 109 *N.J.* 348, 537 *A.2d* 667 (1988). Thus, she should not have been allowed to repeat the details of the children's allegations of sexual abuse before the jury. Because a reversal is in order on other grounds, we need not separately address this impropriety.

child is lying. It's not real hard to tell whether a child is lying. Anybody who has raised a child has some knowledge about what cues them to whether a child is lying or not. You might look at whether the child appears sincere emotionally. You might look at whether what they are feeling is what they are saying, if they are telling you something frightening happening and they are giggling you are not going to believe them and if they are telling you something frightening happened and they are having a hard time telling you and maybe they are crying and shaking at the same time you are going to be more prone to believe them.

She recapped what she looks for in determining the truthfulness of an alleged child sex victim:

Okay, I look for—I look for many different things. I look for whether the child appears to be sincere. I look for whether or not the feeling that they have at the time goes with what they are saying or whether it contradicts what they are saying. I go for whether there are a lot of different behaviors that all point to the same conclusion. For example, is what the child saying, does that match the demonstrations that they give when they try to explain it with their hands or with dolls, does it match the pictures that they draw for me? Does it match what they told the mother; does it match what they told the DYFS worker; does it match what they told the prosecutor or investigator; or does it match what they told me? I look for consistency across a lot of different kinds of behaviors.

In a child who is telling the truth you don't get every detail the same because that's the nature of human memory that sometimes we forget one detail or another but you get a broad consistency. A lot of different behaviors all back each other up, they all say the same thing. A child who is lying or being programmed will be the opposite. You will tend to get a consistent verbal statement but if you then say well draw a picture for me they don't know what they are talking about, they can't draw a picture that will back it up or you say show it to me on the doll, they don't know what to do or they do something that looks like something you would see on television, very romantic, very general not specific, concrete details. That's another thing I look for are there realistic, concrete, specific kinds of details that are not the kinds of things that you would tend to see on a television so that any kid could pick up or any cable t.v. or movie that any kid could just pick up, that what I look for.

Milchman was then asked this question:

Q. Doctor, based on your examinations of the girls, can you give this jury your expert opinion as to whether or not both C.Q. and N.Q. were sexually abused?

She answered:

A. I believe that they were sexually abused.

On cross-examination, Milchman acknowledged that C.Q. had reported to her that she had once observed defendant and her mother engage in sexual intercourse and that C.Q. told her that

the boys in her apartment building stand around in the hall-ways and try to "get" girls with "big breasts."

Milchman acknowledged that other "stressors" in a child's life could account for helplessness and secrecy she observed in C.Q. and N.Q. Among them were poverty, the jailing of a family member and difficult living conditions. On redirect, Milchman offered her view that C.W. was not forcing the children to make these reports. She thought that, if anything, C.W. under-reacted; she noticed that the children had a vaginal discharge, but never had them examined. N.Q. experienced crying, nightmares, and falling grades, but her mother did not respond to these cues that N.Q. might be experiencing some problems. Further, when Milchman met with C.W., C.W. asked her if children ever made up stories of sex abuse. Milchman did not think this was a woman who was "jumping on" the allegations.

The prosecutor's final question to Milchman was this:

Defense counsel has gone through a litany of other possible reasons why the children behaved the way they did in terms of being withdrawn or how they could have come up with this other sexual knowledge, despite the possible stresses of living in a poor neighborhood and a poor environment with a lot of people around, despite the fact that they may have seen [C.Q.], may have seen her mother and [J.Q.] copulating once, or may have seen things on TV, is it still your expert opinion that these children were sexually abused?

She answered "yes."

Defendant testified on his own behalf and denied having any sexual contact with his daughters. He insisted that he loved them very much, and that anyone who would have sex with a child is very sick. Defendant's brother, his present wife and some of his neighbors testified briefly. The brother stated that he saw C.W. once at defendant's apartment after they had separated, and that she was asking defendant for money. A neighbor testified that she became acquainted with C.Q. and N.Q. when they began spending weekends at defendant's apart-ment, and they seemed happy and glad to be with their father. In his closing statements, defense counsel suggested that the charges here were an outgrowth of C.W.'s vindictive plan to

take revenge on a man who had betrayed and beat her. Based on the foregoing evidence, defendant was convicted of each count charged in the indictment. This appeal followed.

IV

*Evid.R.* 56(2) provides that:

(2) A witness, qualified pursuant to Rule 19 as an expert by knowledge, skill, experience, training or education may testify in the form of opinion or otherwise as to matters requiring scientific, technical or other specialized knowledge if such testimony will assist the trier of fact to understand the evidence or determine a fact in issue.

After being qualified as an expert, the witness is limited to testimony which is squarely within the area of expertise. *State v. Zola*, 112 *N.J.* 384, 423, 548 *A.*2d 1022 (1988). The proponent of expert testimony must demonstrate that it would "enhance the knowledge and understanding of lay jurors with respect to other testimony of a special nature normally outside of the usual lay sphere." *State v. Kelly*, 97 *N.J.* 178, 209, 478 *A.*2d 364 (1984) (quoting *State v. Griffin*, 120 *N.J.Super.* 13, 20, 293 *A.*2d 217 (App.Div.1972)). In addition, the proponent must demonstrate that the expert's testimony would be reliable. *Id.* In a new field this can be established in one of three ways: (1) by expert testimony that the scientific premises of the proposed testimony are generally accepted in the appropriate profession; (2) by authoritative scientific and legal writings indicating that the scientific community accepts the premises underlying the proffered testimony; or (3) by judicial opinions that indicate that the expert's premises have gained general acceptance. *Id.* 97 *N.J.* at 210, 478 *A.*2d 364.[6] *See also Ryan v. KDI Sylvan Pools*, 121 *N.J.* 276, 579 *A.*2d 1241 (1990).

Defendant contends that Milchman's testimony incorporated an entirely new field of psychological endeavor (CSAAS) and

[6] In *Rubanick v. Witco Chemical Co., et al.*, 125 *N.J.* 421, 593 *A.*2d 733 (1991), the Supreme Court recently adopted a more flexible standard to establish the reliability of the theory advanced by a causation expert in a toxic tort case. This standard has no applicability here.

that no effort was made by the prosecutor to demonstrate its reliability pursuant to *Kelly*. According to defendant, the erroneous admission of this evidence meets the plain error standard of *R.* 2:10–2. The State counters that any error in the procedure pursuant to which Milchman's testimony was admitted was harmless. While conceding that no record was created to undergird a finding that either of the first two scientific reliability tests of *Kelly* were met, the State contends that "the courts of foreign jurisdictions are nearly unanimous in their acceptance of expert testimony on CSAAS in order to explain delayed disclosure or recantation on the part of a complaining witness" thus satisfying the third *Kelly* test. Neither of these positions is entirely correct.

The obligation of the proponent of expert evidence to meet the requirements of *Evid.R.* 56(2) and *Kelly*, exists whether or not an objection to the proffer is advanced and it is the duty of the trial judge to make a preliminary determination that the testimony would indeed enhance the understanding of the lay jurors; that the witness is qualified by knowledge, skill, experience, training or eduction to render the proffered scientific opinion, and that the expert's scientific premises are reliable. As defendant correctly points out, that did not occur in this case. However, contrary to defendant's view, this procedural defect does not, in itself, compel reversal. The issue is whether the evidence, although not established at trial to be so, was, in fact, reliable. According to the State, it can be demonstrated that CSAAS is reliable under the third prong of *Kelly* thus obviating the possibility that the procedural error in its admission was anything more than harmless. We agree that a portion of Milchman's CSAAS testimony meets the third prong of *Kelly* but not all of it. Neither party seems to have recognized that Milchman's testimony was not a single seamless garment. Rather, it was made up of a number of entirely disparate elements, each subject to distinct analysis resulting in varying conclusions.

## V

Because child sexual abuse cases are often difficult to prove, investigators, lawyers and judges have "with increasing frequency [been] turning to the behavioral and clinical sciences for guidance on issues relevant to the reliability of children's eyewitness testimony." Doris, *The Suggestibility of Children's Recollections* at xi (J. Doris ed. 1991). Overall, six categories of social science expert testimony have developed and have regularly been proffered by the state to support child witnesses in sexual abuse cases. Bulkley, *Social Science Expert Testimony for the Prosecution Regarding Behaviors of Sexually Abused Children: National Trends and Recommendations*, American Bar Association Center on Children and the Law, Washington, D.C. (in preparation) [hereinafter Bulkley, *Social Science Expert Testimony* ].

The first category is "rehabilitative" testimony offered to explain puzzling conduct of the child victim (such as delayed reporting, minimization and recantation) to meet a defense attack on the child's credibility. (One psychiatrist has termed these behaviors as CSAAS. Summit, *The Child Sexual Abuse Accommodation Syndrome*, 7 Child Abuse & Neglect 177 (1983) [hereinafter Summit].) The second category is syndrome evidence, including CSAAS evidence, of supposed typical child victim behaviors (for example, depression, anxiety, bedwetting) proffered, not to explain unusual conduct of the child, but to prove affirmatively that sexual abuse has occurred. The third category is a spin-off of the second with the expert testifying to typical behaviors of a child victim specifically related to the child victim in the case. The fourth is expert testimony that the child *has* been abused and the fifth is testimony that the child is credible. (The sixth category, which has no relevance here, involves profile testimony on the sex offender.) Bulkley, *Social Science Expert Testimony, supra*, at 3–4. The first five of these categories are involved in this case to one extent or another.

Milchman testified that CSAAS explained the childrens' secrecy and delayed reporting; that each child exhibited four out of the five behaviors "found to occur again and again in children who are victims of incest;" that N.Q. exhibited other outward signs of sexual abuse including crying, nightmares and failing grades; that it was her belief that the children had, in fact, been abused; and, that she believed the children (and C.W.) to be credible. We will address these matters serially.

## VI

CSAAS is a theory of relatively recent vintage. It was first enunciated in 1983. *See* Summit, *supra.* In the article, Summit described five characteristics commonly observed in sexually abused children: secrecy, helplessness, accommodation, delayed and unconvincing disclosure and recantation. CSAAS was not intended as a diagnostic device or a test for sexual abuse.[7] It is an example of a class of rehabilitative testimony generally viewed as admissible, not to prove that the child has been abused, but to explain certain behaviors of the child victim and to "rebut an implied or express assertion by the defense that such behaviors indicate the child is lying." Bulkley, *Social Science Expert Testimony, supra* at 4. Its basic purpose is to dispel the idea that secrecy, belated disclosure and/or recantation have the same negative implications in a child abuse case as they would where an offense against an adult is concerned:

If a complaining witness in a burglary trial, after making the initial report, denied several times before testifying at trial that the crime had happened, the jury would have good reason to doubt seriously her credibility at any time. However, in this instance we are concerned with a child who states she has been the victim of sexual abuse by a member of her family. The experts

---

[7]The syndrome does not detect sexual abuse. Rather, it "*assumes* a molestation has occurred and seeks to describe and explain common reactions of children to the experience." *People v. Bowker,* 203 *Cal.App.*3d 385, 394, 249 *Cal.Rptr.* 886, 892 (1988) (emphasis in original). *See People v. Beckley,* 434 *Mich.* 691, 706–07, 456 *N.W.*2d 391, 397–98 (1990); Myers, Bays, Becker, Berliner, Corwin & Saywitz, *Expert Testimony in Child Sexual Abuse Litigation,* 68 Neb.L.Rev. 1, 67 (1989) [hereinafter Myers, *Expert Testimony* ].

testified that in this situation the young victim often feels guilty about testifying against someone she loves and wonders if she is doing the right thing in so testifying. It would be useful to the jury to know that not just this victim but many child victims are ambivalent about the forcefulness with which they want to pursue the complaint, and it is not uncommon for them to deny the act ever happened. Explaining this superficially bizarre behavior by identifying its emotional antecedents could help the jury better assess the witness's credibility.

*State v. Middleton,* 294 *Or.* 427, 657 *P.*2d 1215, 1219–20 (1983) (Campbell, J.). In addition:

While jurors may be capable of personalizing the emotions of victims of physical assault generally, and of assessing witness credibility accordingly, tensions unique to the trauma experienced by a child sexually abused by a family member have remained largely unknown to the public. As the expert's testimony demonstrates the routine indicia of witness reliability—consistency, willingness to aid the prosection, straight-forward rendition of the facts—may, for good reason, be lacking. As a result jurors may impose standards of normalcy on child victim/witnesses who consistently respond in distinctly abnormal fashion.

*Middleton,* 294 *Or.* at 440, 657 *P.*2d at 1222 (Roberts, J., concurring) (1983).

The Supreme Court of Arizona in *State v. Moran,* 151 *Ariz.* 378, 728 *P.*2d 248, 251–52 (1986) adopted the concurring view expressed by Justice Roberts in *Middleton:*

We agree with Justice Roberts's analysis. "Jurors, most of whom are unfamiliar with the behavioral sciences, may benefit from expert testimony" explaining behavior they might otherwise "attribute to inaccuracy or prevarication." [*State v.*] *Lindsey,* 149 *Ariz.* [472] at 474, 720 *P.*2d [73] at 75 [ (1986) ]; *accord State v. Myers,* 359 *N.W.*2d 604, 610 (Minn.1984) (allowing expert testimony explaining "puzzling aspects of the child's conduct and demeanor which the jury could not otherwise bring to its evaluation of [the victim's] credibility"). Such evidence may harm defendant's interests, but we cannot say it is *unfairly* prejudicial; it merely informs jurors that commonly held assumptions are not necessarily accurate and allows them to fairly judge credibility. *See State v. Chaple* [*Chapple* ], *supra* [135 Ariz. 281, 291, 660 P.2d 1208, 1218] (1983).

Put another way, CSAAS is evidence designed to disabuse a jury of false assumptions. As noted by the Supreme Court of Delaware in *Wheat v. State,* 527 *A.*2d 269, 273 (Del.1987), "where a complainant's behavior or testimony is, to the average lay person, superficially inconsistent with the occurrence of a rape ... expert testimony can assist a jury in this regard."

Indeed, this testimony is similar to battered woman syndrome evidence which, according to *Kelly,* helps a jury to understand why a woman, subjected to beatings by her husband, does not simply leave him. *State v. Kelly, supra,* 97 *N.J.* at 205, 478 *A.*2d 364. In neither case is the evidence offered as probative of the question of whether abuse has occurred. Rather, the evidence is only offered to explain reactions to abuse. This is to prevent jurors from viewing these reactions as inconsistent with the happening of abuse and to avert the commonsense conclusion in a battered wife case that if the wife really had been battered she would have moved out, and in a child sex abuse case, that if the child really had been abused, he or she would have told someone immediately or would not have recanted.

This shielding use of CSAAS testimony has been approved by our Supreme Court in *State v. R.W.,* 104 *N.J.* 14, 26, 514 *A.*2d 1287 (1986):

Understandably, when such testing has a reasonable probative bearing upon an infant witness's competency or credibility, it may be sought, and its results proffered, on an adequate showing, by the proponent of the child's testimony, as well as by the defendant. In *State v. Myers,* 359 *N.W.*2d 604 (Minn.1984), the Minnesota Supreme Court reviewed an incest prosecution in which a doctor had testified concerning the characteristics of abused children, including testimony that sexually abused children often will not report the abusive incidents. The court affirmed the use of the testimony, stating:

With respect to most crimes the credibility of a witness is peculiarly within the competence of the jury, whose common experience affords sufficient basis for the assessment of credibility. In most cases, even though an expert's testimony may arguably provide the jury with potentially useful information, the possibility that the jury may be unduly influenced by an expert's opinion mitigates against admission. Nor should the credibility of witnesses in criminal trials turn on the outcome of a battle among experts. The nature, however, of the sexual abuse of children places lay jurors at a disadvantage. Incest is prohibited in all or almost all cultures, and the common experience of the jury may represent a less than adequate foundation for assessing the credibility of a young child who complains of sexual abuse. If the victim of a burglary failed to report the crime promptly, a jury would have good reason to doubt that person's credibility. A young child subjected to sexual abuse, however, may for some time be either unaware or uncertain of the criminality of the abuser's conduct.... By explaining the emotional antecedents of the victim's conduct and the peculiar impact of the

crime on other members of the family, an expert can assist the jury in evaluating the credibility of the complainant. [*Id.* at 609, 610.]

It has also received nearly universal judicial approval in other jurisdictions. *See, e.g., Ex parte Hill,* 553 *So.*2d 1138 (Ala. 1989); *Nelson v. State,* 782 *P.*2d 290 (Alaska Ct.App.1989); *Bostic v. State,* 772 *P.*2d 1089 (Alaska Ct.App.1989), *rev'd on other grounds,* 805 *P.*2d 344 (Alaska 1991); *State v. Moran, supra,* 728 *P.*2d at 252; *State v. Lindsey,* 149 *Ariz.* 472, 720 *P.*2d 73, 75 (1986); *People v. Harlan,* 222 *Cal.App.*3d 439, 271 *Cal.Rptr.* 653 (1990); *People v. Stark,* 213 *Cal.App.*3d 107, 261 *Cal.Rptr.* 479 (1989); *People v. Bowker, supra,* 249 *Cal.Rptr.* at 891; *People v. Gray,* 187 *Cal.App.*3d 213, 231 *Cal.Rptr.* 658, 660 (1986); *People v. Dunnahoo,* 152 *Cal.App.*3d 561, 199 *Cal.Rptr.* 796, 804 (1984); *People v. Hampton,* 746 *P.*2d 947 (Colo.1987); *State v. Spigarolo,* 210 *Conn.* 359, 556 *A.*2d 112, *cert. denied,* 493 *U.S.* 933, 110 *S.Ct.* 322, 107 *L.Ed.*2d 312 (1989); *Wheat v. State, supra; Hicks v. State,* 196 *Ga.App.* 311, 396 *S.E.*2d 60 (1990); *State v. Batangan,* 71 *Haw.* 552, 799 *P.*2d 48 (1990); *People v. Wasson,* 211 *Ill.App.*3d 264, 155 *Ill.Dec.* 710, 569 *N.E.*2d 1321 (1991); *People v. Nelson,* 203 *Ill.App.*3d 1038, 149 *Ill.Dec.* 161, 561 *N.E.*2d 439 (1990), *appeal denied,* 136 *Ill.*2d 551, 153 *Ill.Dec.* 381, 567 *N.E.*2d 339 (1991); *State v. Black,* 537 *A.*2d 1154, 1156 (Me.1988); *State v. Preston,* 581 *A.*2d 404, 407 (Me.1990); *People v. Beckley, supra; People v. Matlock,* 153 *Mich.App.* 171, 395 *N.W.*2d 274, 277 (Ct.App.1986); *State v. Sandberg,* 406 *N.W.*2d 506, 511 (Minn. 1987); *State v. Hall,* 406 *N.W.*2d 503 (Minn.1987); *State v. Myers,* 359 *N.W.*2d 604, 610 (Minn.1984); *State v. Davis,* 422 *N.W.*2d 296 (Minn.Ct.App.1988); *Hosford v. State,* 560 *So.*2d 163 (Miss.1990); *Smith v. State,* 100 *Nev.* 570, 688 *P.*2d 326, 326–27 (1984); *People v. Gallow,* 171 *A.D.*2d 1061, 569 *N.Y.S.*2d 530, *appeal denied,* 77 *N.Y.*2d 995, 575 *N.E.*2d 406, 571 *N.Y.S.*2d 920 (1991); *People v. Benjamin R.,* 103 *A.D.*2d 663, 481 *N.Y.S.*2d 827, 831–32 (1984); *State v. Bailey,* 89 *N.C.App.* 212, 365 *S.E.*2d 651, 655 (1988); *State v. Timperio,* 38 *Ohio App.*3d 156, 528 *N.E.*2d 594 (1987); *State v. Garfield,* 34 *Ohio*

*App.*3d 300, 302, 518 *N.E.*2d 568 (1986); *State v. Middleton, supra; State v. Pettit,* 66 *Or.App.* 575, 675 *P.*2d 183, 185, *review denied,* 297 *Or.* 227, 683 *P.*2d 91 (1984); *State v. Rogers,* 293 *S.C.* 505, 362 *S.E.*2d 7, 8 (1987); *State v. Gokey,* 154 *Vt.* 129, 574 *A.*2d 766 (1990); *State v. Hicks,* 148 *Vt.* 459, 535 *A.*2d 776, 777 (1987); *State v. Petrich,* 101 *Wash.*2d 566, 683 *P.*2d 173, 179–80 (1984); *State v. Cleveland,* 58 *Wash.App.* 634, 794 *P.*2d 546, 551–52, *cert. denied,* 115 *Wash.*2d 1029, 803 *P.*2d 324 (1990), *cert. denied,* —— *U.S.* ——, 111 *S.Ct.* 1415, 113 *L.Ed.*2d 468 (1991); *State v. Madison,* 53 *Wash.App.* 754, 770 *P.*2d 662, *review denied,* 113 *Wash.*2d 1002, 777 *P.*2d 1050 (1989); *State v. Jensen,* 147 *Wis.*2d 240, 432 *N.W.*2d 913 (1988); *Gale v. State,* 792 *P.*2d 570 (Wyo.1990); *Scadden v. State,* 732 *P.*2d 1036, 1046 (Wyo.1987). *But see Mitchell v. Commonwealth,* 777 *S.W.*2d 930 (Ky.1989); *Hester v. Commonwealth,* 734 *S.W.*2d 457 (Ky.), *cert. denied,* 484 *U.S.* 989, 108 S.Ct. 510, 98 *L.Ed.*2d 508 (1987); *Commonwealth v. Garcia,* 403 *Pa.Super.* 280, 588 *A.*2d 951 (Super.Ct.1991); *Commonwealth v. Dunkle,* 385 *Pa.Super.* 317, 561 *A.*2d 5 (Super.Ct.1989), *appeal granted,* 524 *Pa.* 625, 574 *A.*2d 67 (1990). *Compare Duckett v. State,* 797 *S.W.*2d 906 (Tex.Crim.App.1990) *with Dunnington v. State,* 740 *S.W.*2d 896 (Tex.Ct.App.1987).

▪ Moreover, a myriad of expert writings in the psychology field have countenanced this limited use of CSAAS evidence. *See* McCord, *Expert Psychological Testimony about Child Complainants in Sexual Abuse Prosecutions: A Foray into the Admissibility of Novel Psychological Evidence,* 77 Crim.L. & Criminology 1, 58–64 (1986) [hereinafter McCord]; Myers, *Expert Testimony, supra;* J. Myers, *Child Witness Law and Practice* (1987 & Supp.1991); Bulkley, *Legal Proceedings, Reforms, and Emerging Issues in Child Sexual Abuse Cases,* 6 Behav. Sci. & The Law 153, 173–75 (1988); Bulkley, *Social Science Expert Testimony, supra* at 9–13 (suggesting, however, that more research regarding public knowledge of sexual abuse is necessary); Melton & Limber, *Psychologists' Involvement in Cases of Child Maltreatment,* 44 Amer.Psych. 1225

(Sept.1989) (more research needed on public awareness of sexual abuse) [hereinafter Melton & Limber]; Lorenzen, *The Admissibility of Expert Psychological Testimony in Cases Involving the Sexual Misuse of a Child,* U.Miami L.Rev. 1033, 1055–56 (1988); Note, *Expert Testimony in Child Sexual Abuse Prosecutions: A Spectrum of Uses,* 68 B.U.L.Rev. 155, 167–70 (1988); Carter, *Admissibility of Expert Testimony in Child Sexual Abuse Cases in California: Retire Kelly–Frye and Return to a Traditional Analysis,* 22 Loy.L.A.L.Rev. 1103, 1133 (1989). *But see* Cohen, *The Unreliability of Expert Testimony on the Typical Characteristics of Sexual Abuse Victims,* 74 Geo.L.J. 429, 447 (1985). Thus, to the extent that Milchman presented the CSAAS testimony for the purpose of explaining N.Q. and C.Q.'s secrecy and delayed reporting of the abuse, we think it met the third reliability test established in *State v. Kelly, supra;* that it could have met the second reliability test of *Kelly,* and that its admission, although procedurally flawed, is no basis for reversal.

But Milchman did not limit her CSAAS testimony to the rehabilitative task of explaining the girls' secrecy and delayed reporting. Instead, she stated without qualification that N.Q. and C.Q. each exhibited four of the five symptoms of CSAAS which she described as a pattern of behavior found to "occur again and again in children who are victims of incest." She also testified that N.Q. exhibited other "behavior syndromes of trauma," including "crying, nightmares and falling grades." This testimony left the jury with the impression that syndrome evidence is somehow diagnostic of sexual abuse and that because the girls evidenced four of the five symptoms exhibited by "victims of incest" and other "behavior syndromes of trauma" this was affirmative evidence that sexual abuse occurred. Not so. The consensus among scholars is that there are as yet no scientifically reliable indicators of child sexual abuse.[8] *See*

---

[8]Among the supposed symptoms of child sexual abuse are the following:

Conte, *Child Sexual Abuse: Looking Backward and Forward*, in Family Sexual Abuse: Frontline Research and Evaluation 3 (M.Q. Patton ed. 1991); Berliner, *Deciding Whether a Child Has Been Sexually Abused*, in Sexual Abuse Allegations in Custody and Visitation Cases 48, 55 (E.B. Nicholson & J. Bulkley eds. 1988) [hereinafter Berliner]; Melton & Limber, *supra* at 1229; McCord, *supra* at 38; Melton, *Childrens' Testimony in Cases of Alleged Sexual Abuse*, 8 Advances in Developmental & Behavioral Pediatrics, 179, 189 (1987); Corwin, Berliner, Goodman, Goodwin & White, *Child Sexual Abuse and Custody Disputes: No Easy Answers*, 2 J. Interpersonal Violence 91 (1987); Golding, *Mental Health Professionals and the Courts: The Ethics of Expertise*, 13 Int'l J. Law & Psychiatry 281 (1990); Lloyd, *Expert Testimony in Child Sexual Abuse Cases: What Does the Expert Know?*, presented at American Bar Association Fifth National Conference on Chil-

---

1. Secrecy; 2. A feeling of helplessness; 3. A sense of being trapped by the situation; 4. Accommodation to the abuse; 5. Nightmares (especially nightmares with an assaultive content); 6. Sleep disturbance; 7. Loss of appetite; 8. Regressive behavior; 9. Pseudo-mature behavior; 10. Withdrawal; 11. Acting out; 12. Difficulty recalling details such as dates and times; 13. Fear of men; 14. Fear of further abuse; 15. Depression and anxiety; 16. Embarrassment at peer's knowledge of the abuse; 17. A negative view of sex; 18. A poor relationship between mother and daughter; 19. Running away from home; 20. Doubt that the nonabusing parent is strong enough to protect the child; 21. Confusion; 22. Conflicting versions of events; 23. Inarticulate descriptions; 24. Drawings by the child which contain enlarged sexual organs, or in the case of male genitalia, an erection and/or ejaculation; 25. Knowledge of sexual matters which would not be possessed by a child of the particular age unless the child had been exposed to information about sex or to sex acts; 26. Use of sexual words of which a child of the particular age would have no knowledge unless the child had been exposed to the words; 27. Use of anatomically correct dolls in ways that are inexplicable in a child of the particular age unless the child has experienced sexual contact; 28. Delay in reporting abuse; 29. Recantation. [J. Myers, *Child Witness Law and Practice, supra,* at 152–53].

These commentators characterized this compilation as an "ambiguous laundry list of symptoms." *Id.* at 159.

dren and the Law, November 1, 2, 3, 1990; Bulkley, *Social Science Expert Testimony, supra.*[9]

> It is impossible to make a general statement about the effects of sexual abuse on children. Children react differently to different situations depending on the number of variables that may be operating at the time of the occurrence.... Children who are sexually abused are not special children with special characteristics; they are not the victims of one particular offense, nor do they sustain identical injuries.

Rosenfeld, *The Clinical Management of Incest and Sexual Abuse of Children,* 22 Trauma 2, 3 (Oct.1980).

> "No two children or families will react in exactly the same way to the presence of child sexual abuse. Also, because they are under a great deal of stress, their reactions and behavioral signs—whether conscious or unconscious—are subject to misinterpretation. Generalizations about the effects of any kind of interpersonal crisis often do a disservice to all individuals involved."

MacFarlane, *Sexual Abuse of Children,* in The Victimization of Women 93, 97 (J. Chapman & M. Gates eds. 1978). In short, as of this writing, the consensus of contemporary social science wisdom is that "[t]here is ... no demographic or psychological profile of children who have been sexually assaulted.... Clinical and empirical studies have established that there are effects of sexual abuse on children but have failed to demonstrate that there is a universal or uniform response." Berliner, *supra,* at 54–55.

This view has been adopted by a growing number of the jurisdictions which have faced the issue of whether syndrome evidence, including CSAAS, may be used as affirmative proof that abuse occurred. The following jurisdictions grappled with the question of the scientific reliability of such a use and have rejected the notion outright as without scientific basis. *See, e.g., Nelson v. State, supra; State v. Moran, supra; Johnson v. State,* 292 *Ark.* 632, 732 *S.W.*2d 817 (1987); *Russell v. State,* 289 *Ark.* 533, 712 *S.W.*2d 916 (1986); *People v. Leon,* 214 *Cal.App.*3d 925, 263 *Cal.Rptr.* 77 (Ct.App.1989); *People v. Jeff,*

---

[9]Indeed, Milchman herself testified at this trial that she is conducting "research" in this area and that a "pilot" project to test the affirmative use of syndrome evidence is underway.

204 *Cal.App.*3d 309, 251 *Cal.Rptr.* 135 (1988); *People v. Bowker, supra; Mitchell v. Commonwealth, supra; Lantrip v. Commonwealth,* 713 *S.W.*2d 816 (Ky.1986); *State v. Lawrence,* 541 *A.*2d 1291 (Me. 1988); *State v. Black, supra; People v. Beckley, supra; People v. Duell,* 163 *A.D.*2d 866, 558 *N.Y.S.*2d 395 (1990); *State v. Milbradt,* 305 *Or.* 621, 756 *P.*2d 620 (1988); *Commonwealth v. Garcia, supra; State v. Hudnall,* 293 *S.C.* 97, 359 *S.E.*2d 59 (1987); *State v. Schimpf,* 782 *S.W.*2d 186 (Tenn.Crim.App.1989); *State v. Gokey, supra; State v. Jensen, supra.*

It is true that some courts have accepted the affirmative use of syndrome evidence in a child sex abuse case. [*See e.g., U.S. v. Azure,* 801 *F.*2d 336 (8th Cir.1986); *People v. Pronovost,* 756 *P.*2d 387 (Colo.Ct.App.1987), *aff'd,* 773 *P.*2d 555 (1989); *Ward v. State,* 519 *So.*2d 1082 (Fla.Dist.Ct.App.1988); *Keri v. State,* 179 *Ga.App.* 664, 347 *S.E.*2d 236 (Ct.App.1986); *People v. Server,* 148 *Ill.App.*3d 888, 102 *Ill.Dec.* 239, 499 *N.E.*2d 1019 (1986), *appeal denied,* 114 *Ill.*2d 555, 108 *Ill.Dec.* 423, 508 *N.E.*2d 734, *cert. denied,* 484 *U.S.* 842, 108 *S.Ct.* 131, 98 *L.Ed.*2d 88 (1987); *State v. Reser,* 244 *Kan.* 306, 767 *P.*2d 1277 (1989); *State v. Garden,* 404 *N.W.*2d 912 (Minn.Ct.App.1987); *State v. Walters,* 247 *Mont.* 84, 806 *P.*2d 497 (1991); *Townsend v. State,* 103 *Nev.* 113, 734 *P.*2d 705 (1987); *In re Nicole V.,* 71 *N.Y.*2d 112, 518 *N.E.*2d 914, 524 *N.Y.S.*2d 19 (1987); *State v. Bachman,* 446 *N.W.*2d 271 (S.D.1989); *State v. Timperio, supra; State v. Edward Charles L.,* 398 *S.E.*2d 123 (W.Va.1990); *Griego v. State,* 761 *P.*2d 973 (Wyo.1988).]

However, most of these decisions failed to distinguish between the rehabilitative and affirmative use of syndrome evidence; a number misread the cases which approved the rehabilitative use of such evidence as support for the more expansive use, and several incorrectly analogized child sexual abuse accomodation syndrome evidence to battered child and battered wife syndrome evidence.

A Myers article explains how this misuse of syndrome evidence came about:

> Summit did not intend the accommodation syndrome as a diagnostic device. The syndrome does not detect sexual abuse. Rather, it assumes the presence of abuse, and explains the child's reactions to it. Thus, child sexual abuse accommodation syndrome is not the sexual abuse analogue of battered child syndrome, which is diagnostic of physical abuse. With battered child syndrome, one reasons from type of injury to cause of injury. Thus, battered child syndrome is probative of physical abuse. With child sexual abuse accommodation syndrome, by contrast, one reasons from presence of sexual abuse to reactions to sexual abuse. Thus, the accommodation syndrome is not probative of abuse.
>
> Unfortunately, a number of mental health professionals, lawyers, and commentators drew unwarranted comparisons between battered child syndrome and child sexual abuse accommodation syndrome. This error led to considerable confusion. First, some professionals misinterpreted Summit's article, believing Summit had discovered a "syndrome" that could diagnose sexual abuse. This mistake is understandable, if not forgivable. Mental health and legal professionals working in the child abuse area had long been accustomed to thinking in terms of syndrome evidence to prove physical abuse. Battered child syndrome was an accepted diagnosis by the time Summit's accommodation syndrome came along in 1983. It was natural for professionals to transfer their understanding of battered child syndrome to this new syndrome, and to conclude that the accommodation syndrome, like battered child syndrome, could be used to detect abuse.
>
> If the first error was erroneously equating child sexual abuse accommodation syndrome with a diagnostic device, the second mistake was hardly less serious. Some professionals conflated the reactions described by Summit, which are not probative of abuse, with behaviors that are probative of abuse. This combination of behaviors was then denominated a syndrome, the presence of which was supposedly probative of abuse. The defect of this "syndrome" is that some of its components are probative of abuse and others are not. Opinions based on such a "syndrome" are of dubious reliability.
>
> Widespread misunderstanding of child sexual abuse accommodation syndrome had unfortunate consequences. Expert testimony based in whole or in part on the syndrome led some courts to believe the accommodation syndrome was designed to diagnose child sexual abuse. So viewed, the syndrome is doomed to fail because it simply does not diagnose. Little wonder courts became suspicious of professional ability to detect sexual abuse. Unlike battered child syndrome, which is highly probative of nonaccidental injury, the accommodation syndrome appeared anything but reliable. Courts were not informed that the accommodation syndrome was being asked to perform a task it could not accomplish.
>
> The accommodation syndrome has a place in the courtroom. The syndrome helps explain why many sexually abused children delay reporting their abuse, and why many children recant allegations of abuse and deny that anything occurred. If use of the syndrome is confined to these rehabilitative functions,

the confusion clears, and the accommodation syndrome serves a useful forensic function.

Myers, *Expert Testimony, supra,* at 67–68.

We have concluded that syndrome evidence proffered either generally or as related to a particular child to prove affirmatively that abuse occurred is scientifically unreliable. "Whether described in terms of 'indicators,' 'syndromes,' 'patterns' or 'clinical features,' the objective of such evidence is to establish on the basis of present conduct that in the past someone has been subjected to a specific trauma." *State v. Black, supra,* 537 *A.*2d at 1157 (Me.1988). Under ideal circumstances, such a nexus is problematic. These circumstances are far from ideal. This record and our independent research evidence no general scientific approbation of such an analysis and a sharp difference of opinion among jurisdictions as to its reliability, thus obviating the conclusion that the affirmative use of syndrome evidence has gained "general" acceptance. We therefore hold that Milchman's unrestricted testimony that C.Q. and N.Q. exhibited four out of five elements of CSAAS and that N.Q. showed other trauma syndrome behaviors should not have been admitted to prove to the jury that abuse occurred because the reliability of that evidence to prove an occurrence of abuse has not as yet been established. *See State v. Kelly, supra.* This is not to suggest that such evidence is intrinsically flawed. We are in no position to make such an absolute judgment. Rather, we hold that as social science and jurisprudence are presently constituted, we can have no faith in its reliability.[10]

## VI

Equally important in our determination is Milchman's testimony before the jury that she believed the stories told by

---

[10]Were this the only error in the case, we might have temporarily remanded it to the trial judge for the development of a full record on the reliability of syndrome evidence as affirmative proof of sex abuse prior to determining whether to reverse or affirm. Because a retrial is otherwise necessary, such a procedure is unwarranted.

the children (and C.W.) and her reasons for that belief. She stated on several occasions that it was her "expert opinion" that the children had been sexually abused. In addition to relying on the syndrome evidence she observed, Milchman's expert opinion was based in great measure on her conclusions as to the credibility of the children's recitation of events.

There is no basis in our law for the expression of an expert opinion as to the truthfulness of a statement by another witness. Such a statement does not fall within any of the methods provided in the Rules of Evidence for supporting the credibility of a witness. *See* R. Biunno, *Current N.J. Rules of Evidence*, Comments to *R.* 20, 22, 47 (1991). Such testimony is quite distinct from character evidence relating to the traits of honesty and veracity which is permissible under *Evid.R.* 22. On the contrary, in this case, the character of the child witnesses for truthfulness was never addressed by the expert. What was said was that the expert believed that particular statements of the witnesses were true. Our rules do not allow such bolstering.

Moreover credibility is an issue which is peculiarly within the jury's ken and with respect to which ordinarily jurors require no expert assistance. *See, e.g., State v. Lindsey, supra,* 149 *Ariz.* at 75, 720 *P.*2d at 76; *Townsend v. State, supra,* 734 *P.*2d at 709; *State v. Holloway,* 82 *N.C.App.* 586, 347 *S.E.*2d 72, 73 (Ct.App.1986); *State v. Friedrich,* 135 *Wis.*2d 1, 398 *N.W.*2d 763, 770 (1987).

> The question of whether a particular witness is testifying in a truthful manner is one that must be answered in reliance upon inferences drawn from the ordinary experiences of life and common knowledge as to the natural tendencies of human nature, as well as upon observations of the demeanor and character of the witness. The phenomenon of lying, and situations in which prevarications might be expected to occur, have traditionally been regarded as within the ordinary facility of jurors to assess. For this reason, the question of a witness' credibility has routinely been regarded as a decision reserved exclusively for the jury.
>
> It is an encroachment upon the province of the jury to permit admission of expert testimony on the issue of a witness' credibility. (*Commonwealth v. Seese,* 512 *Pa.* 439, 517 *A.*2d 920, 922 (1986) (citations omitted).

*See Commonwealth v. Davis,* 518 *Pa.* 77, 541 *A.*2d 315 (1988). Our cases are replete with references to the nature of a credibility evaluation; it involves a judgment by people of "reason and fairness," *Johnson v. Salem Corp.,* 97 *N.J.* 78, 92, 477 *A.*2d 1246 (1984), exercising the "rational process of an ordinarily intelligent mind," *Ferdinand v. Agricultural Ins. Co. of Watertown, N.Y.,* 22 *N.J.* 482, 494, 126 *A.*2d 323 (1956), applying "general knowledge and common experience." *Id.* We believe that it is an incursion on one of the jury's most important functions to allow an expert witness to evaluate the statements of another witness.

By far the most dangerous aspect of opinion testimony as to whether a witness is telling the truth is that it is scientifically unreliable. There is simply no scientific foundation for an expert's evaluation of the credibility of a witness or for the conclusion that a psychologist or other social scientist has some particular ability to ferret out truthful from deceitful testimony. Absent a question of capacity, an expert is no better qualified than a lay person to assess the credibility of a witness. *See Biro v. Prudential Ins. Co.,* 110 *N.J.Super.* 391, 401, 265 *A.*2d 830 (App.Div.1970), *rev'd on dissent,* 57 *N.J.* 204, 271 *A.*2d 1 (1970). Indeed, one commentator has characterized such Pseudo–Scientism as an ethical violation by the expert witness:

> The ethical violation occurs because of the implicit misrepresentation of a commonsense moral and legal judgment as a clinical or scientific decision. Whether a child is telling the truth is not a judgment based on specialized knowledge. Indeed, the counterexamples that are often given (i.e., cases in which children have given graphic descriptions of sexual acts) prove the point. The inference that such descriptions are credible is a matter of common sense. Even if the expert is correct in his or her judgment, the presentation of the judgment as based on specialized knowledge is deceptive, and the result is usurpation of the role of the trier of fact with concomitant diminution of the appearance of justice. (Limber & Melton, *supra* at 1230).

We are in agreement with this analysis as is nearly every other jurisdiction which has faced this issue. *See, e.g., Nelson v. State, supra; Thompson v. State,* 769 *P.*2d 997 (Alaska Ct.App.1989); *State v. Moran, supra,* 151 *Ariz.* at 385, 728 *P.*2d at 255; *State v. Lindsey, supra,* 149 *Ariz.* at 474–75, 720

*P.*2d at 75–76; *Logan v. State,* 299 *Ark.* 255, 773 *S.W.*2d 419 (1989); *People v. Oliver,* 745 *P.*2d 222, 225 (Colo.1987); *In re Noel M.,* 23 *Conn.App.* 410, 580 *A.*2d 996, 1002 (App.Ct.1990); *Powell v. State,* 527 *A.*2d 276, 279 (Del.1987), *Wheat v. State, supra; Tingle v. State,* 536 *So.*2d 202 (Fla.1988); *Page v. Zordan,* 564 *So.*2d 500, 502 (Fla.Dist.Ct.App.1990); *Fuller v. State,* 540 *So.*2d 182, 184 (Fla.Dist.Ct.App.1989); *Smith v. State,* 259 *Ga.* 135, 377 *S.E.*2d 158, *cert. denied,* 493 *U.S.* 825, 110 *S.Ct.* 88, 107 *L.Ed.*2d 53 (1989); *Stewart v. State,* 555 *N.E.*2d 121 (Ind.1990); *State v. Brotherton,* 384 *N.W.*2d 375, 378–79 (Iowa 1986); *State v. Myers,* 382 *N.W.*2d 91, 97 (Iowa 1986); *State v. Wilson,* 247 *Kan.* 87, 795 *P.*2d 336, 343–44 (1990); *State v. Jackson,* 239 *Kan.* 463, 470, 721 *P.*2d 232, 238 (1986); *People v. Beckley, supra,* 456 *N.W.*2d at 407; *State v. Miller,* 377 *N.W.*2d 506 (Minn.Ct.App.1985); *State v. Newman,* 109 *N.M.* 263, 784 *P.*2d 1006 (Ct.App.), *cert. denied,* 109 *N.M.* 262, 784 *P.*2d 1005 (1989); *State v. Bailey, supra,* 89 *N.C.App.* at 219, 365 *S.E.*2d at 655; *State v. Holloway, supra,* 82 *N.C.App.* at 587, 347 *S.E.*2d at 73; *State v. Boston,* 46 *Ohio St.*3d 108, 545 *N.E.*2d 1220, 1240 (1989); *Lawrence v. State,* 796 *P.*2d 1176 (Okla.Crim.App.1990); *State v. Milbradt, supra,* 305 *Or.* at 629, 756 *P.*2d at 624; *State v. Middleton, supra,* 294 *Or.* at 437 n. 11, 657 *P.*2d at 1221 n. 11; *Commonwealth v. Seese, supra; Commonwealth v. Garcia, supra; McCafferty v. Solem,* 449 *N.W.*2d 590 (S.D.1989); *Duckett v. State, supra; Ochs v. Martinez,* 789 *S.W.*2d 949, 956 (Tex.Ct.App.1990); *State v. Rimmasch,* 775 *P.*2d 388 (Utah 1989); *State v. Catsam,* 148 *Vt.* 366, 534 *A.*2d 184 (1987); *State v. Madison, supra; Stephens v. State,* 774 *P.*2d 60 (Wyo.1989). *But see State v. Busch,* 515 *So.*2d 605 (La.Ct.App.1987); *State v. Myers, supra; State v. French,* 233 *Mont.* 364, 760 *P.*2d 86 (1988); *State v. Bachman, supra,* 446 *N.W.*2d at 276. (*State v. Kim,* 64 *Haw.* 598, 645 *P.*2d 1330 (1982), was recently overruled in *State v. Batangan, supra.*) We have thus concluded that Milchman's expert testimony that the child witnesses and C.W. were telling the truth was improper.

## VII

 Under the circumstances, a reversal is warranted because of improper bolstering of the children's credibility and because the opinion that the children had been abused had no reliable basis. Milchman's opinion was based, in its entirety, on the affirmative use of syndrome evidence which we have ruled does not meet the reliability standard and upon her evaluation of the children's truthfulness, for which there is neither warrant nor scientific foundation.

We cannot say that this testimony was not influential in the jury's weighing of N.Q. and C.Q.'s testimony against defendant's denials. The evidence in this case was subject to varying interpretations. While Dr. Bresnahan stated that a stretched hymen was not normal and was consistent with sexual abuse, she also acknowledged that a girl could be born with a larger than usual hymenal opening. In our view, the improper admission of the expert evidence could have tipped the balance and created a real possibility of injustice, "one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." *State v. Melvin*, 65 *N.J.* 1, 18–19, 319 *A.*2d 450 (1974) (quoting *State v. Macon*, 57 *N.J.* 325, 335–36, 273 *A.*2d 1 (1971)). We thus reverse and remand for a new trial.

## VIII

The retrial makes it unnecessary for us to deal with the other issues raised by defendant. We note only that the judge will have to decide at the time of the retrial whether the provisions of *N.J.S.A.* 2A:84A–32.4 are applicable and whether the testimony of the victim witnesses who will, by then, be more than three years older than they were at the original trial, should be received by closed circuit television. *Maryland v. Craig,* — *U.S.* ——, 110 *S.Ct.* 3157, 111 *L.Ed.*2d 666 (1990); *State v. Crandall*, 120 *N.J.* 649, 577 *A.*2d 483 (1990); *State in Interest of B.F.*, 230 *N.J.Super.* 153, 159, 553 *A.*2d 40 (App.Div.1989).

We note as well that there is ordinarily a lag between new advances in scientific research and the time that those advances are reflected in case law. It may be that during the pendency of this case, conclusions, as yet unpublished and unavailable to us, have been reached regarding the use of syndrome evidence including CSAAS in child sex abuse cases. We thus do not foreclose the presentation of such evidence to the trial judge on the retrial nor do we preclude the judge from reaching different conclusions than ours based upon the new evidence which might develop.

## IX

In light of the state of social science research and case law as of this writing, we hold that CSAAS evidence is generally reliable to explain secrecy, belated disclosure and recantation by a child sex abuse victim; that syndrome evidence including CSAAS is not reliable to prove that sex abuse, in fact, occurred; and that an expert social science witness has neither the legal authority nor the scientific qualifications to opine as to the truthfulness of the statement of another witness.

Reversed and remanded.

STERN, J.A.D. (dissenting).

It is hard for me to disagree with a technically precise and well written opinion of the court. This is particularly true because I strongly believe that the criminal law must be approached with technical precision in an effort to assure equal justice. However, while I agree with much stated in the majority opinion, I am compelled to dissent in this case.

Prosecutors can be expected to remember their ethical responsibilities in assuring defendants a fair trial. But they cannot always be expected to offer evidence they believe in good faith to be reliable and admissible and to simultaneously request *Evid.R.* 8 hearings to determine those very questions. Our rules and cases require them to request *Evid.R.* 8 hear-

ings, and suggest that they do so, only in certain situations. *See e.g., State v. Hampton,* 61 *N.J.* 250, 270–272, 294 *A.*2d 23 (1972); *R.* 3:13–1(b); *Evid.R.* 8. It is fundamental that the defense has an obligation to object to inadmissible evidence. Yet the majority reverses this conviction based on its technical determinations in the absence of any objection by the defense at trial to the witness' qualifications "as an expert in child sexual abuse" or to the evidence offered and in the absence of any contest to its admissibility or probative value. I cannot agree with this conclusion.

Doctors can offer their opinions as to causation based on reasonable medical certainty and without belief beyond a reasonable doubt. *See State v. Smith,* 210 *N.J.Super.* 43, 57–58, 509 *A.*2d 206 (App.Div.1986), *certif. denied* 105 *N.J.* 582, 523 *A.*2d 210 (1986). Further, psychiatrists and psychologists treat patients based on their assessment of the cause of an apparent psychological problem. This frequently turns on their assessment of the patient's credibility. I cannot, therefore, understand why a psychologist, qualified as an expert without objection, cannot tell the jury what he or she believes to be the cause of an individual's problem. *See, e.g., Rubanick v. Witco Chemical Corp.,* 125 *N.J.* 421, 593 *A.*2d 733 (1991); *Evid.R.* 56(2), 57. *See also R.S. v. Knighton,* 125 *N.J.* 79, 86–91, 592 *A.*2d 1157 (1991) (regarding admissibility of statements to physicians relevant to diagnosis and treatment). Similarly, I do not understand why an expert, qualified without objection, cannot explain to a jury why the expert believes, based on observations and interviews of an individual, that that individual suffers from a particular syndrome and the scientific basis therefor. No one would think it unreasonable or inappropriate for Dr. Milchman or any other similarly qualified clinical psychologist to treat the Q. children for child abuse syndrome; yet the majority concludes that the doctors cannot tell a jury that those children have the syndrome. To me this puts technicalities above reason at a time our Supreme Court continues to enlarge the admissibility of expert testimony, subject to examination of the ex-

pert's credibility which may turn on the details of his or her experience and qualifications. *See Rubanick v. Witco Chemical Corp., supra; Ryan v. KDI Sylvan Pools, Inc.,* 121 *N.J.* 276, 579 *A.*2d 1241 (1991). As recently said in *Lanzet v. Greenberg,* 126 *N.J.* 168, 186, 594 *A.*2d 1309 (1991),

[i]n our recently-decided *Ryan v. KDI Sylvan Pools, Inc.,* 121 *N.J.* 276, 579 *A.*2d 1241 (1990), we noted that the primary function of courts is to determine the admissibility of evidence, not its reliability. *See James v. City of East Orange,* 246 *N.J.Super.* 554, 588 *A.*2d 412 (App.Div.1991) (once competency of medical expert has been established, the jury is 'to determine the credibility, weight and probative value of the expert's testimony').

I completely concur in the majority's thorough analysis that "rehabilitative" testimony concerning the impact of child sexual abuse syndrome is admissible. In fact, as the majority details, our Supreme Court has quoted with favor out-of-state authority to the effect that "[b]y explaining the emotional antecedent of the victim's conduct and the peculiar impact of the crime on other members of the family, an expert can assist the jury in evaluating the credibility of the complainant." *State v. R.W.,* 104 *N.J.* 14, 26, 514 *A.*2d 1287 (1986), quoting *State v. Myers,* 359 *N.W.*2d 604, 610 (Minn.1984). Hence, my colleagues and I agree that the testimony of Dr. Milchman concerning the characteristics and attitude of child abuse victims, including the possibility of initial false statements and delayed truthfulness, was admissible, even in the absence of an *Evid.R.* 8 hearing. I therefore join the court in holding "that CSAAS evidence is generally reliable to explain secrecy, belated disclosure and recantation by a child sex abuse victim," at 43, 599 *A.*2d at 189, and was so admissible here.

The majority, however, holds that Dr. Milchman's testimony went beyond permissible bounds because she "did not limit her CSAAS testimony to the rehabilitative task of explaining the girls' secrecy and delayed reporting." At 33, 599 *A.*2d at 184. Rather, she detailed the symptoms of sexual abuse which N.Q. and C.Q. exhibited, indicating that those symptoms were the types exhibited by "victims of incest." *Id.* But if an expert can testify as to certain characteristics and impact of child

sexual abuse, there is no reason why the expert cannot also testify as to what he or she observed with respect to the victim, as Dr. Milchman did. Nor should the expert be prevented from stating (as Dr. Milchman did here by direct and hypothetical questions) his or her beliefs in terms of the impact of child abuse if there is other evidence which reflects that the individual, in fact, suffered from those symptoms. My colleagues conclude, however, that "[t]he consensus among scholars is that there are as yet no scientifically reliable indicators of child sexual abuse," at 33, 599 *A*.2d at 184, and that many, if not most, jurisdictions have concluded that "affirmative" "syndrome evidence" is not admissible because it is "without scientific basis." At 33, 599 *A*.2d at 185. Yet, the majority also recognizes the existence of cases which "have accepted the affirmative use of syndrome evidence." At 36, 599 *A*.2d at 185.

The major problem with my colleagues' analysis is that it summarily rejects the contrary precedent, *but cf. Rubanick v. Witco Chemical Co., supra* (referring in the toxic tort setting to admissibility when expert evidence is deemed reliable by a substantial minority of the scientific community), and substitutes its judgment for that of some experts because of a split of authority "and a sharp difference of opinion among jurisdictions as to its reliability, thus obviating the conclusion that the affirmative use of syndrome evidence has gained 'general' acceptance." At 38, 599 *A*.2d at 187. Nevertheless, my colleagues might remand for an *Evid.R.* 8 hearing "on the reliability of syndrome evidence as affirmative proof of sex abuse" if a retrial were not "otherwise necessary." *Id.*, n. 10. And the majority does not "foreclose the presentation of such evidence ... on the retrial" or "preclude the judge from reaching different conclusions than ours based on the new evidence which might develop." At 43, 599 *A*.2d at 189.

My disagreement with the majority is on a relatively narrow ground: I would conduct the *Evid.R.* 8 hearing—and permit both parties to develop the proofs regarding the scientific reliability of the affirmative CSAAS testimony—before, not

after, reversing the conviction.[1] *Cf. State v. Kelly*, 61 *N.J.* 283, 294–295, 294 *A.*2d 41 (1972); *State v. Crandall*, 231 *N.J.Super.* 124, 134, 555 *A.*2d 35 (App.Div.1989), *rev'd o.g.* 120 *N.J.* 649, 577 *A.*2d 483 (1990); *State v. Gunter*, 231 *N.J.Super.* 34, 554 *A.*2d 1356 (App.Div.1989), *certif. den.* 117 *N.J.* 81, 563 *A.*2d 841 (1989). I would do so because in my view the other basis which the majority finds to make "a retrial ... otherwise necessary"—the expert's references to the credibility of the witnesses, even assuming it error in context—might well be harmless, if the "affirmative" CSAAS syndrome evidence is deemed admissible. If an *Evid.R.* 8 hearing can be conducted next week or next month before (*see R.* 3:13–1(b)) or during the retrial mandated by the reversal, why cannot it be conducted next week or next month before the reversal is ordered? The hearing should be conducted now because the evidence may well be reliable and, therefore, admissible.

> What constitutes reasonable reliability depends in part on the context of the proceedings involved. The policy underlying Rule 56 is to exclude expert evidence when the danger it poses of prejudice, confusion and diversion of attention exceeds its helpfulness to the factfinder because the expertise is not sufficiently reliable. In part, the Rule entails a weighing of reliability against prejudice in light of the context in which the evidence is offered. Expert evidence that poses too great a danger of prejudice in some situations, and for some purposes, may be admissible in other circumstances where it will be more helpful and less prejudicial. [*State v. Cavallo*, 88 *N.J.* 508, 520, 443 *A.*2d 1020 (1982) (interpreting *Evid.R.* 56 as it then read)].

I recognize the independent obligation of the trial judge to assure a fair trial and to prevent "the danger of prejudice through the introduction of unreliable evidence." *Id.* at 518, 443 *A.*2d 1020. But evidence can be shown to be sufficiently reliable by expert testimony, scientific writings or judicial precedent, *id.* at 521, 443 *A.*2d 1020; *see also e.g., Windmere Inc. v. International Ins. Co.*, 105 *N.J.* 373, 379, 522 *A.*2d 405

---

[1] Had there been an objection to Dr. Milchman's qualifications or testimony, she could have endeavored to develop its reliability at trial. Dr. Milchman has taught and written articles on the subject. *Cf. Rubanick v. Witco Chemical Corp., supra.*

(1987),[2] and "[a]lthough the proponent of an expert opinion must demonstrate that the data or information used were soundly and reliably generated and are of a type reasonably relied on by comparable experts in the particular field, our rule [*Evid.R.* 56(2)] does not insist on a demonstration of the objective reliability of the opinions reached or the inferences drawn from such data or information." *Rubanick v. Witco Chemical Corp., supra,* 125 *N.J.* at 447, 593 *A.2d* 733.

*Evid.R.* 56 was amended on September 15, 1981 effective July 1, 1982. *See N.J.S.A.* 2A:84A-33 *et seq.* In *Ryan v. KDI Sylvan Pools, Inc., supra,* the Supreme Court considered the obligation of a trial judge in determining the admissibility of expert testimony under the Rule, as amended. It said:

> We interpret *Evidence Rule* 56(2) to require that a court make an inquiry into and a finding on whether experts in the given field rely on certain information. If such reliance be found, then it is presumed to be reasonable. That interpretation of the *Rule* strikes a fair balance between the intent of the amended language and the "spirit" of the prior *Rule,* which has been interpreted to require the court to make a determination on the reliability of the testimony. The amendment was made explicitly to expand the data on which an expert can rely in forming an opinion. The focus should be on what the experts in fact rely on, not on whether the court thinks they should so rely. Requiring the trial court to make a finding on whether experts in the field actually rely on certain information satisfies the intent of the new language. Allowing the court to overrule that presumption of reliability will result in the exclusion of evidence only under unusual or extreme circumstances, thus satisfying the "spirit" of the former *Rule.* [121 *N.J.* at 289, 579 *A.2d* 1241].

The victims of battered women syndrome appear to exhibit some characteristics similar to victims of child sexual abuse syndrome, as developed in the majority opinion; *see also State v. Kelly,* 97 *N.J.* 178, 190–197, 478 *A.2d* 364 (1984), and in *Kelly,* the Supreme Court held "that the battered-woman's syndrome is an appropriate subject for expert testimony; that the ex-

---

[2]I do not suggest that the scientific literature or out-of-State precedent is so authoritative and persuasive as to render the affirmative CSAAS testimony admissible without full exploration of the relevant issues at an *Evid.R.* 8 hearing. *Compare, State v. Cathcart,* 247 *N.J.Super.* 340, 589 *A.2d* 193 (App. Div.1991).

perts' conclusions, despite the relative newness of the field, are sufficiently reliable under New Jersey's standards for scientific testimony; and that defendant's expert was sufficiently qualified." *Id.* at 187, 478 *A.*2d 364. Hence, the Court remanded for a retrial at which, based on the same proofs, "the expert's testimony on the battered-woman's syndrome shall be admitted." *Id.* I recognize that there the victim was defending against a homicide charge and desired to use the evidence in support of her self-defense claim, whereas here the State seeks to use the expert proofs to show that a child was the victim of abuse. But *Evid.R.* 56 is party neutral even in a criminal case. *See e.g., State v. Cavallo, supra; State v. Cary,* 49 *N.J.* 343, 230 *A.*2d 384 (1967). *See, generally Annot.,* "Admissibility, at Criminal Prosecution, of Expert Testimony on Rape Trauma Syndrome," 42 *A.L.R.* 4th 879 (1985 and 1991 supp.).

My colleagues appear to reverse the conviction now, in the absence of proofs or sufficient evidence in the literature or case precedent of scientific reliability, notwithstanding some judicial precedent they reject, because they also conclude that Dr. Milchman conveyed to the jury her belief that the victims were credible.

Dr. Milchman, the expert in child abuse syndrome, testified that she believed the victims, but she explained why, based on her observations and her scientific training and professional expertise. Her testimony related to her expertise and observations in reaching her ultimate conclusion. Dr. Milchman on direct was, in essence, discounting the contemplated defense. She said, "[i]f the children give concrete, realistic details ... that are plausible that is very suggestive that they have experienced" what they described. She explained how an expert can tell if a child is "programmed." When the judge interrupted this testimony—still in the absence of objection—and stated that credibility was for the jury to decide, the prosecutor responded by saying, "I am talking about what the doctor's experience is and what she looks for." The judge immediately instructed the jury, "[i]t is your ultimate responsibility as to

credibility for that matter or even reliability as to the testimony that is being presented to you. That's from everybody including, of course, the infant witnesses." [3]

If a prosecutor's investigator can tell the jury that he or she believes that controlled dangerous substances are packaged with intent to distribute, the critical issue in a case involving possession with intent to distribute, *see State v. Odom*, 116 *N.J.* 65, 560 *A.*2d 1198 (1989), I do not see why experts cannot tell the jury that an individual is the victim of child sexual abuse syndrome in a case where the victim is alleged to have been sexually assaulted as a child. *See Evid.R.* 56(2), 57. Certainly the investigator in the *Odom* case is not directly commenting on the credibility of a state's witness but the distinction may be more semantic than real in these circumstances. In any event, Dr. Milchman did not testify that defendant committed the crime or was guilty. The testimony was only that the children

---

[3]Later, after developed on relevant cross-examination, Dr. Milchman also testified that C.W. did not "present to me as a programming mother." I emphasize that the testimony should be limited to the general characteristics of child sexual abuse syndrome and, if admissible, a conclusion that a particular person had those symptoms or characteristics. I do not want to be understood as approving direct expert testimony on the victim's credibility, and agree with the majority that such testimony is generally inadmissible. *See, generally, Annot.* "Experts–Rape Trauma Syndrome," *supra,* 42 *A.L.R.* 4th at 879–917; *see also Annot.* "Necessity and Admissibility of Expert Testimony as to Credibility of Witness," 20 *A.L.R.*3d 684 (1968 and 1991 supp.). But to the extent Dr. Milchman's testimony was inadmissible because it went beyond what was admissible in explaining the syndrome and the factors she observed, it may be deemed harmless in context, in the absence of objection and with the above quoted instruction. The judge also instructed the jury regarding "fresh complaint" evidence and as to its duty to determine credibility, including credibility of the experts who testified, and that they were not bound by the expert testimony. In the absence of an objection to the jury instructions, I need not discuss them further and cannot conclude that any deficiency constitutes plain error. *See State v. Bethune,* 121 *N.J.* 137, 148–149, 578 *A.*2d 364 (1990). Further, this direct appeal is not the occasion to consider the claim of ineffective assistance of counsel, *see State v. Dixon,* 125 *N.J.* 223, 262, 593 *A.*2d 266 (1991); *State v. Sparano,* 249 *N.J.Super.* 411, 592 *A.*2d 608 (App.Div.1991), notwithstanding his failure to object to the questions regarding credibility.

were victims of child sexual abuse, the "ultimate issue ... to be decided by the trier of the fact." *Evid.R.* 56(3). Thus, if on remand it is determined that the expert can testify that C.Q. and N.Q. were the victims of child sexual abuse, I can find no harm flowing from the expert's testimony, stated in the absence of objection, to the extent it indicated that she believed the victims. The victims themselves testified that they were abused; the expert's opinion was consistent, similarly concluding that they were victims of child sexual abuse.[4] In these circumstances the expert's express statement of credibility offers little more than the obvious acceptance of their stories. I would therefore find it harmless that the expert may have been understood to say that she believed the children. Stated differently, *if* the "affirmative" CSAAS opinion evidence is found reliable and admissible at an *Evid.R.* 8 hearing, the fact that the expert also indicated that she found the children to have been credible would be harmless in my judgment.[5]

---

[4]Dr. Bresnahan testified that N.Q. had a stretched or enlarged hymen. It was stipulated that C.Q. also had a stretched hymen, something which Dr. Bresnahan stated was "consistent with sexual abuse." There was no challenge to the physical evidence. The doctor stated that "[b]ased on the history that [N.Q.] gave me and the physical examination I would say it was consistent with sexual abuse."

[5]It is true that defense counsel harped on the credibility of N.Q. and C.Q. who also identified their father as the assailant. Counsel emphasized in summation that C.W. wanted to get even with defendant for his other relationships, for his years of abuse and then for having left her after she commenced a relationship with another man and had his child. The prosecutor, on the other hand, emphasized the children's credibility by reference to their reaction to the suggestion they lied and why defendant's theory was incredible. Defense counsel never mentioned Dr. Bresnahan or Dr. Milchman in summation. The prosecutor referred to Dr. Bresnahan's testimony about a stretched hymen. As to the CSAAS testimony, he said "[y]ou heard Dr. Milchman testify as to the Child Sexual Abuse Accommodation syndrome which some of you may look at well that's a psychiatrist, you know these people are crazy anyway. I don't believe in any of that garbage. Well, ladies and gentlemen it's up to you how you weigh an expert's opinion. And the judge will instruct you on that." The prosecutor briefly referred to the syndrome evidence, stating "[t]he Accommodation Syndrome deals with secrecy and helplessness and entrapment in

To reverse this conviction in the absence of a determination of scientific reliability and without a remand to determine that issue, because an expert witness concluded based on her expertise that the children were victims of sexual abuse, is, in my judgment, inappropriate in the absence of the slightest objection or contest when the testimony was taken.[6]

Accordingly, I dissent.

---

accommodation and delayed disclosure. And every single one of those factors was present here." The children's credibility was therefore a critical issue in the case, but essentially related to whether there had been sexual abuse or a manufactured story. The prosecutor made no reference in his summation to Dr. Milchman's assessment of their credibility or to her belief that C.W. did not manufacture or teach the story. Rather, he addressed the children's credibility in terms of what they said about the suggestion they might lie, about the facts themselves and about the events on which the defense built its case. The doctor's assessment of their credibility, mentioned without objection during her testimony and not mentioned or highlighted in summation, was simply not capable of producing an unjust result or a result the jury would not have otherwise reached. *State v. Melvin*, 65 *N.J.* 1, 18–19, 319 *A.2d* 450 (1974); *State v. Macon*, 57 *N.J.* 325, 336, 273 *A.2d* 1 (1971); *R.* 2:10–2. (I need not here discuss the distinction in the test between constitutional and non-constitutional error). In any event, the comments on credibility need not be addressed or found as a basis for reversing this conviction before the admissibility of the affirmative CSAAS evidence is determined.

[6] I would not reverse merely because of any violation of *State v. D.R.*, 109 *N.J.* 348, 537 *A.2d* 667 (1988), because the testimony challenged thereunder would now be admissible. *See Evid.R.* 63(33). A retrial should not be ordered in these circumstances where the same evidence would be admissible on retrial. *Cf. State v. Bethune, supra,* 121 *N.J.* at 146, 578 *A.2d* 364. *See also R.S. v. Knighton, supra,* 125 *N.J.* at 97–98, 592 *A.2d* 1157. In any event, I need not address the issues not addressed by the majority, although I do believe that the concurrent or consecutive nature of the sentences needs clarification.